B. T. MORAN, Inc., v. FIRST SECURITY CORPORATION.

No. 5141. Decided August 3, 1933. (24 P. [2d] 384.)

318

*R. J. Hogan* and *E. M. Morrissey*, both of Salt Lake City, for appellant.

*Thatcher & Young*, of Ogden, for respondent.

FOLLAND, Justice.

This is an action by plaintiff to recover $2,437.50, balance alleged to be due for goods manufactured, sold, and delivered to defendant pursuant to a written contract dated November 21, 1928. Defendant answered denying liability and filed a counterclaim wherein it sought to recover judgment against plaintiff for damages in the sum of $9,160 for breach of contract. The case was tried to the court without a jury. From a judgment in favor of defendant dismissing plaintiff's complaint and for damages in the sum of $2,000 on its counterclaim, plaintiff appeals and assigns numerous errors. For convenience we shall first treat the assignments of error to the dismissal of the complaint, and later take up the assignments directed to the judgment on the counterclaim.

The evidence discloses the following facts: Defendant is a Delaware holding corporation, owning practically all of the stock in a number of banks in Utah, Idaho, and Wyoming. Its principal place of business is Ogden, Utah. M. S. Eccles is its president, and E. G. Bennett is its vice president, manager, and purchasing agent. Plaintiff is an Illinois corporation engaged in the business of manufacturing and selling leather wallets and advertising matter consisting of form letters and cards designed to promote savings accounts in banks, and the furnishing of operators to manage such advertising campaigns. B. T. Moran is the president and manager of plaintiff corporation. Its sales agent throughout the Intermountain West at the time of the execution of this contract was E. A. Waugh. As a result of negotiations between Waugh and Bennett a proposal for contract was drawn by Waugh and signed by Bennett on the night of November 21, 1928, and sent by mail to the office of the company at Chicago for acceptance. It was, after receipt, accepted by B. T. Moran at Chicago who wrote his name on the contract under the words "Accepted: B. T. Moran, Inc." It is conceded the order was not a contract until accepted by the corporation. One of the disputed points in the case is when the offer was accepted. The contract is as follows:

"B. T. Moran,
"400 North Michigan Avenue,
"Chicago.

Manufacturer for an                                          "Date Nov. 21, 1928.
Ship to First Security Corporation
City      Ogden      State of Utah.

| Quan. | Description | Price each |
|---|---|---|
| 24,500 | Letters at per M | $15.00 |
| 144,000 | Cards at per M | 5.00 |
| 1,500 | Men's Goat Skin Single Units | 1.45 |
| 1,500 | Men's Ostrich Grain Single Units | 1.45 |
| 1,500 | Men's Calf Skin Single Units | 1.45 |
| 1,500 | Women's Goat Skin Units | 1.45 |
| 1,500 | Women's Ostrich Grain Units | 1.45 |

To be shipped by express F. O. B. Factory. Terms: Net 30 days.

"Stamp Wallets

"Per copy attached—Letters per copy attached six different banks —The fewer the words the better the appearance of wallet.

"B. T. Moran, Inc., agrees, without additional charge to furnish an operator to manage purchaser's campaign for a period not to exceed thirty days for each thousand wallets ordered.

"Remarks.

"Five operators at once per letter. Rush shipment—Exclusive in all towns in which corporation has banks.

"All oral and other representations and understandings are fully set forth herein, and this contract is not subject to cancellation without the consent of both parties hereto.

"Purchaser      First Security Corporation
            "By E. G. Bennett,
                        Authorized Purchasing Agent V. P.
"Accepted:
"B. T. Moran, Inc.
   "Salesman E. A. Waugh,
      "Representing B. T. Moran, Inc."

The contract as signed refers to a letter "per copy attached." There was a difference between the parties as to the identity of the letter referred to. Defendant claimed the letter was one written by Waugh to Bennett outlining the requirements of the several banks, which letter was admitted in evidence. Plaintiff's testimony was to the effect that a letter written by Waugh to B. T. Moran was the one referred

to. This letter was identified as an exhibit, but was not admitted in evidence for the reason it was not sufficiently connected up with the defendant. No error is assigned to its exclusion. The wallets, letters, and cards referred to in the above-quoted contract were to be used by the defendant's banks at Logan, Rock Springs, Idaho Falls, Pocatello, Boise, and Nampa. The full order for the wallets was prepared and shipped, as were the letters and cards for all the banks except the one at Boise. A bill was submitted by plaintiff to defendant which included all these goods in the total sum of $11,597.50. The defendant promptly paid $9,160 but refused to pay the balance of $2,437.50 for wallets shipped to the Pacific National Bank at Boise. This action was commenced to recover such balance claimed to be due and payable. Defendant defends this action on the ground, as claimed by it, that it canceled the order so far as it affected all supplies for the Boise bank, including, not only letters and cards, but also wallets, and that notice of cancellation was given before its offer was accepted by plaintiff and before the contract became a complete executory contract. The evidence with respect to cancellation shows that the written order was signed by Bennett at about 8:30 p. m. on the evening of November 21st. On the same evening, and after the order was signed, Bennett had a conversation over the telephone with Mr. Tucker, cashier of defendant's bank at Boise, and learned from him that Waugh had not correctly reported *Tucker's views with respect to the desirability of an adver-*tising campaign on behalf of the Boise bank. Tucker claimed that he was not in favor of the campaign at all. It appears that the defendant had only recently acquired a controlling interest in the Pacific National Bank at Boise and was about to change its name so it was inadvisable to print any advertising matter until the change of name could be effected. Bennett testified he attempted but failed to get in touch with Mr. Waugh that evening, but that the next morning he sent a telegram addressed to him at the Hotel Utah in Salt Lake City as follows: "Cancel work on order until can get in touch

with you. 'Phone me promptly on your return." That Waugh called Bennett on the telephone either the evening of the 22d or the morning of the 23d and stated he had received the telegram and wanted to know why the contract was canceled, and arranged for a meeting which was held on the evening of the 23d at the Hotel Utah in Salt Lake between Eccles, Bennett, and Waugh. At this meeting there was considerable conversation between the parties. It seems there had also been a misunderstanding with respect to the order for Rock Springs. Defendant claims the order for advertising matter for the Rock Springs bank was also canceled, but was later reinstated. The goods were shipped, used, and paid for, and the campaign conducted at Rock Springs. Since that portion of the contract is not now in question we shall make no further reference to it. Bennett testified that at this meeting he stated explicitly to Waugh that the order for Boise was canceled, and said, "Don't you have those supplies stamped or anything like that, because this is a cancellation of the order." That Waugh said it was not too late and he would fix the matter satisfactorily. No cancellation of the Boise order, so far as shown by the record, was transmitted to the office of plaintiff by Waugh, but merely directions to withhold printing of the letters and cards until further instructions. The wallets were made up and delivered to the Boise bank.

This is a law action tried to the court without a jury, and for that reason this court may not weigh the evidence and itself make findings. We may merely examine the record to determine whether there is sufficient competent evidence to support the findings of the trial court, and, if such is found, then it becomes our duty to sustain the findings. The evidence is voluminous, and we shall not attempt to set it out here even in abbreviated form. It is sufficient to say that on each of the disputed points there is evidence in the record which, as we view it, would support findings either in favor of the plaintiff or the defendant on the respective contentions made by each. Two ques-

tions arise: First, did the defendant give notice of the cancellation of its order for wallets for the Boise bank; and, second, if such notice was in fact given was it given before acceptance of the order by the plaintiff at its Chicago office?

Mr. Bennett testified directly that he did cancel the order both by telegram on November 22d and by conversation with Waugh on the evening of the 23d. There is undoubtedly sufficient evidence to show notice of cancellation. Whether it was given timely is a question of fact, and whether notice to Waugh was notice to his principal is a question of law. The court made finding that on or about November 22, 1928, and before the order had been accepted by plaintiff, the defendant withdrew and countermanded the order so far as the same related to the Pacific National Bank of Boise. Appellant attacks the finding as erroneous and not supported by evidence, and contends that the defendant did not sustain the burden of proving modification or cancellation of the order before acceptance.

If notification to Waugh is notice to his principal, then we think there is sufficient evidence to support the finding. Mr. Moran testified that he received the order through the mail on the 23d of November and on or about that date placed his signature of acceptance on the contract and gave directions to the factory to commence work on the order; that his plant was of such capacity that the 7,500 wallets could be manufactured in about two days. The defendant relies on other facts and circumstances tending to prove or proving that acceptance was not thus promptly given to the contract. Notice of acceptance was sent to the defendant by letter dated November 28th, as follows:

"B. T. Moran, Inc.
"400 North Michigan Avenue,
"Chicago.

"November 28, 1928.

"First Security Corporation, Ogden, Utah.
"Gentlemen: Attention Mr. E. G. Bennett, V. P.
"We acknowledge with thanks your order of the 21st for 7,500 combination wallets and dime banks, 24,500 letters and 144,000 cards.

All these items are now being prepared and will be shipped as promptly as possible.

"We shall start the campaign in all of the banks (5), except the Pacific National of Boise, next week.

"Very truly yours, B. T. Moran, Inc.
"B. T. Moran."

Moran testified that it was his practice to acknowledge orders within 24 hours of receipt, although this was not an invariable rule. From the letter it appears that the work of manufacture of the goods had commenced, although not yet completed. The wallets were not received at Boise until on or about December 15th. The court could well find as it did, from all the evidence, that cancellation of the order, either by telegram of the 22d or verbal notice on the 23d, was given prior to acceptance of the order. Certainly notice of cancellation was given before notice of acceptance was mailed from plaintiff's office in Chicago.

The rule, as stated in 1 Page on the Law of Contracts (2d Ed.) paragraph 152, is as follows: "If an order is subject to approval by some designated officer of the seller, such contract does not take effect until it has been approved and such approval has been communicated ■ to the buyer." See, also, *Krohn-Fecheimer Co.* v. *Palmer*, 282 Mo. 82, 221 S. W. 353, 10 A. L. R. 673. Such an order as the one in question might, however, have been accepted by filling the order and shipping the goods. 1 Page on the Law of Contracts 154; 13 C. J. 284. The order was not filled or the goods shipped until after November 23d.

While appellant does not concede there was a cancellation, it strenuously contends that the notice to the agent was not notice to his principal since the agent's authority was limited, and that notice of such limitation of authority was contained in the contract signed by the defendant. The contract provides: "All oral and other represen- ■ tations and understandings are fully set forth herein, and this contract is not subject to cancellation without the

consent of both parties hereto." This language merely limits the authority of the agent to the terms and conditions of the agreement or offer as incorporated in the writing. Certainly such agent may not, after acceptance of the same by his principal, modify or change any of the terms or conditions of the contract. This, however, does not deny his authority to receive, on behalf of his principal, notice of withdrawal or cancellation of the order in whole or in part before it became a completed contract by acceptance. The words, "this contract is not subject to cancellation without the consent of both parties hereto," can, of course, not limit the right of the offeror to withdraw or change his offer before acceptance. If this language be construed to be a stipulation that the offeror cannot withdraw his offer before acceptance it is without consideration and hence not binding. The rule is stated in 23 R. C. L. p. 1288, as follows: "In case of orders for goods given to a traveling salesman of the seller, whose authority extends only to the solicitation of orders and the forwarding of them to his principal for acceptance or confirmation, it is well settled that the order or offer may be withdrawn at any time before it has been accepted by the seller. Although an order does not provide that it is subject to the seller's approval, and does provide that it is not subject to change or countermand, it, nevertheless, is held that it may be countermanded prior to its acceptance by the seller, where it is given to an agent whose only authority is to take orders and forward them to his principal for acceptance." The cases are to the same effect: *Cedar Rapids National Bank* v. *McCord,* 98 Ark. 81, 135 S. W. 365; *Hallwood Cash Register Co.* v. *Finnegan* (Sup.) 84 N. Y. S. 154; *Howe Scale Co.* v. *Wolfshaut* (Sup.) 170 N. Y. S. 943; *Night Commander Lighting Co.* v. *Brown,* 213 Mich. 214, 181 N. W. 979, 980; *Krohn-Fechheimer Co.* v. *Palmer,* supra; *Bauman* v. *McManus,* 75 Kan. 106, 89 P. 15, 10 L. R. A. (N. S.) 1138.

Ordinarily notice to an agent touching the subject-matter of his agency or in regard to the transaction in which he is

engaged is notice to his principal. *Modern Woodmen of America* v. *Berry*, 100 Neb. 820, 161 N. W. 534, Ann. Cas. 1918D, 302. Notice of cancellation or withdrawal of an order or offer is notice to the principal where given to the agent who took the order, he having apparent authority to receive such notice. 55 C. J. 87; *Night Commander Lighting Co.* v. *Brown*, supra; *Womack* v. *Dalton Adding Machine Co.* (Tex. Civ. App.) 285 S. W. 680. In the case of *Night Commander Lighting Co.* v. *Brown*, supra, the court said:

"It is elemental that an order such as this, though it contain the words 'not subject to countermand,' may be countermanded at any time before acceptance. Until so accepted, it is simply an offer to purchase, and in no way creates a binding agreement. 13 C. J. 293; *Peck* v. *Freese*, 101 Mich. 321, 59 N. W. 600; *Challenge, etc., Co.* v. *Kerr*, 93 Mich. 328, 53 N. W. 555. Plaintiff's counsel contend that 'by requesting the salesman to countermand this order the defendant made the salesman his agent to perform such service for him,' and, as the notice of countermand was not communicated to the plaintiff at its office, none was in fact and in law given. With this contention we are unable to agree. The notice of countermand given to the same agent who took the order was, in our opinion, notice to the plaintiff. It was the agent's duty to communicate it to his principal, and his failure to do so in no way relieved the plaintiff from the effect thereof. Mechem on Agency, § 1831; Elliott on Contracts, § 33; *Goodspeed* v. *Wiard Plow Co.*, 45 Mich. 322, 7 N. W. 902; *Westinghouse Electric Co.* v. *Hubert*, 175 Mich. 568, 141 N. W. 600, Ann Cas. 1915A, 1099."

Notice of cancellation to Waugh was notice to his principal, whether communicated or not, and had the effect of modifying the offer to the extent of eliminating the order for all of the supplies for the Boise bank. The court found this notice was communicated before acceptance of the offer, and, as we have already indicated, there is sufficient competent evidence in the record to support such a finding.

Error is assigned to the admission of the copy of a telegram from Bennett to Waugh dated November 22d, which we have quoted above. The objection was that the copy of

the telegram was incompetent, not the best evidence, and no foundation had been laid for its admission. The paper offered was a carbon copy from the files of the defendant, and the original of which Mr. Bennett testified was sent to Waugh on the 22d. Defendant served notice on plaintiff to produce the telegram, and demanded it at the trial, and, on failure of plaintiff to produce it, offered the copy. The gravamen of the objection was that the original telegram was the paper delivered to the telegraph office rather than the one received by Waugh. No effort was made to obtain the message from the telegraph office, nor was such shown to have been lost or destroyed. There seems to be some difficulty in determining what are original telegrams within the meaning of the best evidence rule. The weight of authority seems to be that, where the telegraph company is the agent of the sender, the original is the telegram that is delivered. 2 Jones' Commentaries on Evid. (2d Ed.) § 804, p. 1473; 10 R. C. L. 910. Here the sender took the initiative in sending the message, hence the telegraph company would be considered its agent and the telegram delivered would be the original. At any rate, no prejudice resulted to plaintiff by admission of the copy. Mr. Bennett testified that, either on the evening of the 22d or morning of the 23d of November, Waugh called him on the telephone after receiving the telegram and arranged for the meeting which was held on the evening of the 23d. At this meeting Mr. Waugh asked why the order had been canceled, and the matter was discussed. According to Bennett's testimony, of which there is no contradiction, there was a definite cancellation of the order so far as it affected the supplies for the Boise bank. With the copy of the telegram eliminated there was sufficient evidence to support a finding that notice of withdrawal of the offer was communicated to the agent before acceptance of the contract by the principal at Chicago.

We conclude on this part of the case that Waugh had authority to represent his principal for the purpose, not

only of soliciting orders, but of receiving notice of withdrawal or cancellation of the order given him, and that the finding by the trial court that such notice was given before acceptance of the order by his principal at Chicago is supported by evidence. This notice was binding on the company whether or not communicated to the principal. The new offer from the defendant excluded the goods originally ordered for the defendant's bank at Boise. When, therefore, the plaintiff made up and shipped the wallets for the Boise bank, it was not done pursuant to any contract and the defendant had the right to refuse to accept the goods. When Bennett learned that the goods had been received at Boise he wrote to the defendant declining to accept them and offered to return the package unopened. This plaintiff refused, and, having refused to accept the shipment, defendant was under no obligation to return the goods. The findings of fact are sufficiently supported by the evidence, and the judgment is supported by the findings. We find no sufficient error to justify reversal of the judgment of dismissal of plaintiff's complaint.

We come now to the judgment on the counterclaim. Defendant's contention is that plaintiff breached its contract with respect to the quality and experience of operators furnished and the methods adopted in conducting or managing the advertising campaign for savings accounts. It alleged that, because of such breach of contract, the campaign was a failure resulting in damages to defendant of $9,160, the amount paid by it to plaintiff under the contract. The contract provided: "B. T. Moran, Inc., agrees, without additional charge to furnish an operator to manage purchaser's campaign for a period not to exceed thirty days for each thousand wallets ordered." The parties by the terms of the written contract intended to incorporate in the writing all the terms and conditions which the agent was authorized by his principal to incorporate into such an agreement, and this was agreed to by the de-

fendant as evidenced by its execution of the writing. The contract stated: "All oral and other representations and understandings are fully set forth herein." Notwithstanding such declared intention, the trial court permitted the defendant to introduce parol evidence to the effect that Waugh, plaintiff's agent, represented that the operators to be furnished under the provision above quoted would be experienced men in the savings account business, especially trained in sales psychology, and would conduct themselves so as to leave no adverse reflection upon the bank, and that the campaign would be conducted wholly by the plaintiff through its operators except merely the mailing out of letters to customers of the bank by the bank officials. This evidence was objected to as an attempt to modify or alter the terms of the written instrument by parol evidence, and that such representations were beyond the authority of the agent to bind his principal. The objections were overruled and testimony of conversations between Waugh and Bennett and Eccles prior to the execution of the written agreement admitted. These rulings are defended on the theory that the contract was ambiguous, and, under the exceptions to the parol evidence rule, such conversations were admissible to show what was meant by the words "operator" and "purchaser's campaign." The rule is well settled that, where the parties have reduced to writing what appears to be a complete and certain agreement, it will, in the absence of fraud, be conclusively presumed that the writing contained the whole of the agreement between the parties, that it is a complete memorial of such agreement, and that parol evidence of contemporaneous conversations, representations, or statements will not be received for the purpose of varying or adding to the terms of the written document. The rule and the exceptions thereto are well stated in the recent case of *Fox Film Corporation* v. *Ogden Theatre Co.* (Utah) 17 P. (2d). 294. The contract in that case contained recitals similar to those in the contract before us, indicating that the contract as written was intended to be complete. There

are no such latent ambiguities in the contract as to warrant the admission of testimony of such conversations. The admitted conversations tend to enlarge the terms of the contract and to impose obligations on the plaintiff additional to those stated in the writing, not only as to the kind or character of the operators, but also as to responsibility for the conduct of the campaign and its successful results. There is not anything in the written contract which amounts to a guaranty or warranty that the campaign would be successful or that the responsibility for conducting it to a successful conclusion would rest on plaintiff.

There was here no such agreement, shown on its face to be incomplete, as to bring the case within the rule announced in *Halverson* v. *Walker*, 38 Utah 264, 112 P. 804, and *Potter* v. *Easton*, 82 Minn. 247, 84 N. W. 1011, nor is there such ambiguity as to bring the case within the rule announced in *Tyng* v. *Constant-Loraine Inv. Co.*, 47 Utah 330, 154 P. 767; *Egelund* v. *Fayter*, 51 Utah 579, 172 P. 313; and *Jordan* v. *Madsen*, 74 Utah 280, 279 P. 499. The parol evidence should have been excluded. 22 C. J. 1098-1105; 4 Page on Contracts, § 2152, p. 3763; *Bowser & Co.* v. *Independent Dye House*, 276 Mass. 289, 177 N. E. 268; *Farquhar* v. *Hardy Hardware Co.*, 174 N. C. 369, 93 S. E. 922; *Emerson-Brantingham Implement Co.* v. *Edgar*, 39 S. D. 139, 163 N. W. 575; *Eastern Advertising Co.* v. *Patch*, 235 Mass. 580, 127 N. E. 516; *Ridgeway Dynamo & Engine Co.* v. *Pennsylvania Cement Co.*, 221 Pa. 160, 70 A. 557, 18 L. R. A. (N. S.) 613.

The evidence without contradiction shows that the five operators required by the contract were furnished by plaintiff, and that they remained at the respective banks in charge of the advertising campaigns conducted by such banks for a period of a month or six weeks. Complaint is now made that some of these men were inexperienced and that at least one of them conducted himself in an unbecoming manner, which might reflect on the reputation of the bank, yet it is significant that no complaint was made to plaintiff about the character or experi-

ence of these operators or their conduct until after this action was commenced. The contract construed without extraneous aid required that plaintiff supply persons as operators who by age, experience, or training were reasonably qualified to perform the duties incident to such an advertising campaign, and they were required to prosecute the work with reasonable diligence and application. The defendant may show breach of the contract, but, before it can recover, must prove the damage suffered by it because of such breach.

The last assignment of error to which we need pay attention is that the trial court's finding that, "because of the breach of said agreement on the part of the plaintiff and its failure to put over said campaign, defendant suffered damages in the sum of $2,000.00," is erroneous as not stating a finding of any fact as to how or in what manner defendant was damaged and is in the nature of a legal conclusion. This objection must be sustained. There is no finding of any fact on which damages in any specific amount can rest. The mere fact that defendant did not obtain as many new savings accounts as contemplated cannot afford a basis for damages where there is no guaranty that certain results would and could be obtained. The evidence shows that 1,200 new accounts were obtained, but it is silent as to the amount involved in these accounts or the value of them to the bank. It is possible that no evidence could be obtained which would show the probable value of such accounts to the defendant. The element of damages is so speculative, and the cause of damages so uncertain on the record before us, as to afford no basis for a judgment in favor of the defendant. 17 C. J. 756; 8 R. C. L. 438; *Bredemeier* v. *Pacific Supply Co.*, 64 Or. 576, 131 P. 312.

The judgment of dismissal of plaintiff's complaint is affirmed, and the cause remanded to the district court of Weber county for a new trial on defendant's counterclaim. Each party to bear its own costs in this court.

ELIAS HANSEN and MOFFAT, JJ., concur.

STRAUP, Chief Justice (concurring in part, dissenting in part).

I concur in the result on the ground that neither by evidence nor by findings of fact was it shown what damages with any degree of certainty were sustained by the defendant on its counterclaim, except the conclusion that the defendant sustained damages in the sum of $2,000 as the result of plaintiff's breach of the contract. What the nature, character, or extent of the damages were was not found. But the disposition of the case lies deeper than that.

An order was given by the defendant at Salt Lake City to the sales agent of the plaintiff, whose home office was in Chicago, for the purchase of 7,500 combination wallets and dime banks at the agreed price of $10,875, 24,500 circular letters at the agreed price of $367.50, and 144,000 printed cards at the agreed price of $620, or a total agreed price of $11,862.50. The order as given and when accepted at the home office at Chicago constituted one contract. The goods when manufactured were to be delivered to six different banks at different towns or cities, one in Utah, one in Wyoming, and four in Idaho, including a bank at Boise, for which bank, 9,000 letters, 53,000 cards, and 2,750 wallets, at an aggregate price of $2,437.50, were to be manufactured and delivered. The order was given November 21, 1928. To be binding it required acceptance by the plaintiff at its home office. The next morning, according to the testimony of Bennett, the vice president of the defendant and who on its behalf had given the order, he, at Ogden City, sent a telegram to the sales agent of the plaintiff at Salt Lake to "cancel work on order until I can get in touch with you. 'Phone me promptly on your return." On the evening of that day, or in the morning of the next, the 23d, the sales agent at Salt Lake called Bennett by phone, at which time a meeting between them was arranged for the evening of the 23d. By the terms of the telegram, the whole order was canceled until further arrangements were made. On the

evening of the 23d, according to the testimony of Bennett, the whole of the order was reinstated, except as to the goods to be manufactured for and shipped to the bank at Rock Springs, Wyo., and at Boise, Idaho; the goods as to the Rock Springs bank, because of a strike at Rock Springs; the goods for the Boise bank, because of claimed misrepresentations of the sales agent as to statements made by officers or agents in charge of the bank at Boise of the desirability of the goods and because the defendant but recently having taken over the bank at Boise, and until matters could be more definitely checked up and additional arrangements made, no goods were to be manufactured or shipped to either of such banks. According to the testimony of Bennett, the strike at Rock Springs having been suppressed, the order, within a few days, about the 26th, for the manufacture and shipment of goods to that bank was reinstated; but as to the bank at Boise, until the exchange of the bank had been more completely effected, which was thought to be not until some time in February or March, it could not be determined whether any goods for that bank were desired, and, until then, no additional or definite arrangements could be made for the manufacture or shipment of goods to that bank, and that no such further arrangements had been made.

According to the testimony of the plaintiff, the order of November 21st, as originally signed by the defendant for approval by the plaintiff, was received by the plaintiff by air mail in Chicago on November 23d, and on that day was accepted by it by noting on the order that it was accepted, and five or six days thereafter writing the defendant an acknowledgment and receipt of "your order of the 21st for 7,500 combination wallets and dime banks, 24,500 letters and 144,000 cards," constituting the whole of the order as signed, including the goods to be manufactured for and shipped to the Boise bank, and informing the defendant that "all these items are now being prepared and will be shipped as promptly as possible." No reply was made to that by the defendant. The plaintiff gave testimony to

show that, when it received and accepted the order and wrote the defendant of such acceptance, it had neither notice nor knowledge that the original order of November 21st as received by it had in any particular been canceled or modified. However, the court found that, by the telegram sent by Bennett on the morning of the 22d to the sales agent and the negotiations had between them on the evening of the 23d, the order was canceled or modified before the plaintiff in Chicago received and had accepted the order, and that knowledge of and notice to the sales agent of the cancellation or modification was notice to the plaintiff; and thus the court found that the order as to the goods to be manufactured and shipped to the bank at Boise was canceled and had not been reinstated.

Let it be assumed, as held by the prevailing opinion, that the evidence, though in conflict, was sufficient to support the finding so made, and that notice in such particular to the sales agent was notice to the plaintiff; and let it further be assumed that, when the manufactured goods were delivered to the Boise bank December 15, 1928, they, as found by the court, were not accepted by the defendant, notwithstanding it had not informed the plaintiff that it declined to accept the goods, until more than a month thereafter, and in the meantime the goods stored in the bank in the original packages as delivered. All the other goods manufactured for and shipped to the other banks were accepted by the defendant. The court so found, the defendant so alleged, and so was it undisputably shown by the evidence. On January 21, 1929, the defendant sent plaintiff a check in the sum of $9,160, in full payment of all of the goods manufactured and delivered, except the goods delivered to the Boise bank. In reply to that, the plaintiff, on January 23d, acknowledged receipt of the check as "on account of our bill of $11,862.50. We do not know why you did not include $2,437.50 additional" for goods and supplies shipped to Boise. In reply to that, Bennett, on January 25th, wrote the plaintiff that there was no order for the goods shipped

to the Boise bank, that it was expressly understood between the defendant and the sales agent that no work was to be done on the goods for that bank until a further and an additional order was given by the defendant for such goods, that none had been given, that the shipment sent to that bank was intact and in its original condition and asked to be advised what disposition should be made of them. In reply to that, the plaintiff, on January 30th,wrote the defendant that it had no knowledge of any understanding had between the defendant and the sales agent and insisted on payment in full of the bill; and that, if not paid by February 15th, the matter would be placed in the hands of plaintiff's attorneys for collection.

This action was commenced August 20, 1929, to recover the balance claimed to be due amounting to $2,437.50. On October 1, 1929, the defendant filed an answer denying there was anything further due the plaintiff, alleged that the order for the goods at the Boise bank had been cancelled, and the original order in such particular modified before the plaintiff had accepted the order. The defendant by its answer further alleged that:

"Defendant accepted delivery of all goods shipped to the various banks save and except those shipped to the Pacific National Bank of Boise, but as to the latter shipment, defendant, upon the arrival of said goods, refused to accept delivery thereof and immediately notified plaintiff of said refusal.

"That defendant paid plaintiff in accordance with the terms of said order for all goods so ordered or accepted by it and the amount herein sued upon represents the purchase price for those goods so manufactured and shipped to Boise and which were not accepted by defendant."

The defendant also filed a counterclaim in which it, in substance, alleged that the plaintiff was engaged in the business of initiating, promoting, and carrying to a successful conclusion service campaigns for the purpose of educating the public as to the advantage of opening savings accounts, and at the request of purchasers to print circular letters and cards and manufacture a combination wallet and

dime savings bank; that, to make such campaigns successful, the plaintiff agreed to furnish experienced operators throughly versed in banking and particularly relating to savings accounts and who were to manage the campaign and to be in the purchaser's bank during banking hours to meet customers and explain to them the advantage of savings accounts, after banking hours to contact students of public schools, workers in mines, industrial plants, and similar institutions and hold public meetings to educate the public as to the advantage to be derived from savings accounts; that the sales agent advised the defendant that by putting on the campaigns "it was feasible and practical to increase the savings accounts in the various banks," aggregating 11,500 new accounts; that when the letters and cards arrived at the various banks they were promptly mailed out by each bank in accordance with the plan as outlined by the plaintiff, "except the Pacific National Bank at Boise, Idaho, which said order had previously been countermanded," and that each of the other banks performed every duty required of it with respect to the campaign; that "the plaintiff failed and neglected to keep and perform its part of said agreement in this—that instead of furnishing five experienced operators, plaintiff sent out five inexperienced, immature young men, who knew nothing concerning banking or savings accounts, who had had no previous experience as managers of such campaigns," failed to do any work after banking hours, held no meetings, and made no contact with people on the outside; that they failed to conduct the campaign for a period of thirty days for each 1,000 wallets furnished, had not performed their duties diligently or faithfully, and, instead of obtaining approximately 11,500 new accounts as the result of the campaigns, there were obtained not in excess of 1,200 new savings accounts, and, by reason of such failures and delicts, "practically all of said wallets so purchased could not be used and became and are worthless"; that the plaintiff expended $9,160 for the purchase of materials as a part of such campaigns, and, "be-

cause of the breach of said agreement on the part of the plaintiff and its failure to put over said campaigns successfully, said money so expended as aforesaid was of no effect, and that defendant suffered damages in the sum of Nine Thousand One Hundred Sixty ($9,160.00) Dollars," for which amount, together with interest, judgment was prayed against plaintiff.

While the defendant in its letter of January 25th, after it, as alleged and as found by this court, had accepted all of the goods furnished and delivered by the defendant at all of the banks, except the Boise bank, and without objection or complaint had paid the full purchase price thereof, and after the plaintiff had inquired of the defendant why it had not paid for the goods delivered to the Boise bank, stated that the order in such particular had been canceled, and, in general terms, that representations made by the sales agent in connection with the campaigns were misrepresented, yet, not until the defendant filed its counterclaim was there any notice given or complaint made to the plaintiff of any of the delicts or breaches set forth in the counterclaim. It is not contended that the counterclaim related to the goods shipped to the Boise bank where no campaign was had or conducted. The delicts and breaches set forth in the counterclaim related to the goods delivered to and accepted by the defendant prior to December 15, 1928, at the various banks other than the bank at Boise and where campaigns had been conducted by the plaintiff at each bank for a period of thirty days, at some places a little over a month, from about the middle of December, 1928, to about the latter part of January, 1929, when all the campaigns were concluded. A reply was filed putting in issue all the allegations of the counterclaim, except the order or contract as set forth in the prevailing opinion and the acceptance and payment by the defendant of the goods manufactured for and delivered to all of the banks except payment of the goods delivered to the Boise bank, and specifically denied all of the delicts and breaches set forth in the counterclaim.

The question thus is whether on the pleadings and the record the defendant was entitled to maintain its alleged counterclaim. We have a statute, Comp. Laws Utah 1917, § 5158, of the "Uniform Sales Act" which provides:

"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

Such provision frequently has been before the courts, and it uniformly has been held:

"That the purpose of the provision is to prevent the buyer from retaining the goods and using them, failing to give notice of *any breach of the original agreement to the seller until he has been sued for the purchase price*, and then setting up affirmatively a defense by which it is sought to wipe out all of the original purchase price and demand *an affirmative judgment for an additional sum against the seller.*"

Uniform Laws Annotated, vol. 1, Sales Act, p. 184, and cases cited under section 49, corresponding with the section of our statute, and Supplement 1929, p. 114, and cases cited. (Italics added.)

The proposition is well put by the Tennessee court in the case of *Wildman Mfg. Co.* v. *Davenport Hosiery Mills,* 147 Tenn. 551, 249 S. W. 984, 986, that:

"The purpose of this section, indeed, seems apparent, viz. to prevent the buyer from interposing belated claims for damages (too often a mere afterthought) as an offset to a suit begun by the seller for the purchase price."

The provision is applicable not only to warranties, but also to a "breach of any promise or warranty in the contract." Supplement 1929, Uniform Laws Annotated, Sales Act, p. 115; 2 Williston on Sales (2d Ed.) 1261.

The alleged breach set forth in the counterclaim relates to the promise or agreement contained in the order or contract and referred to in the counterclaim, that "B. T. Moran, Inc., (the plaintiff) agrees, without additional charge, to furnish an operator to manage purchaser's campaign for a period not to exceed thirty days for each thousand wallets ordered." It is that stipulation or provision which the defendant by its counterclaim alleges the plaintiff failed to perform and breached. It was a material part of the contract directly relating to and connected with the sale and purchase of the combination wallets and dime banks and the printing of the circulars and cards for which the whole of the money consideration amounting to $11,862.50 was to be paid, and was just as much "a promise" as any other stipuation in the contract, and a failure to perform it, "a breach of a promise" contained in the contract rendering the plaintiff "liable in damages," to the same extent as the breach of any other promise or agreement contained in the contract, or a breach as to the quality or quantity of the goods or of a warranty express or implied, providing notice was given as by section 5158 provided.

An allegation of the giving to the seller reasonable notice of a breach, as provided by the section in question, is in such case essential to a cause of action for damages; and a failure to give such notice precludes any claim for damages for a "breach of any promise or warranty in the contract." Uniform Laws Annotated, Sales Act, p. 186; Supplement 1929, p. 115, and cases there cited.

The counterclaim does not contain any allegation of the giving of any notice with respect to any of the delicts or breaches set forth in the counterclaim and upon which it is founded, nor any excuse or ground, either in law or fact, for not having given it. The absence of such an allegation, under the authorities, is fatal to the defendant's cause and precludes any relief thereunder. Such an allegation being an essential to the defendant's cause—a prerequisite without which no claim for damages may be asserted after ac-

ceptance of the goods—is not cured by evidence, findings, or verdict. However, there is neither evidence nor findings that such a notice was given. So far as disclosed by the record no such notice was given, nor any claim for damages made, until the filing of the counterclaim, eight or nine months after the goods were accepted and more than six months after the purchase price without objection was fully paid and the campaigns concluded. To treat or regard the filing of the counterclaim as a sufficient notice is to fly in the very teeth of both the spirit and letter of section 5158 requiring the giving of notice as by its mandatory provisions provided. In support of the right to maintain the counterclaim, the defendant cites the cases of *Detroit Vapor Stove Co.* v. *Weeter Lumber Co.*, 61 Utah 503, 215 P. 995, 29 A. L. R. 659, and *Detroit Vapor Stove Co.* v. *Farmers' Cash Union,* 61 Utah 567, 216 P. 1075. But for the reasons heretofore stated the cases do not support the contention. They rather make against the defendant, especially the first-sighted case wherein was considered the section in question.

I thus am of the opinion that the judgment awarding the defendant damages should be reversed. Since it is to be reversed, I think it proper to express opinions also as to other assignments considered in the prevailing opinion. I think error was committed in admitting in evidence a copy of a telegram claimed to have been sent by Bennett to the sales agent without a sufficient foundation having been laid to admit secondary evidence of the contents of the telegram. Whether the telegram filed by Bennett with the telegraph office or company for transmission, or whether the telegram transmitted and delivered to the sales agent (when there is no dispute as to the contents of the telegram), is to be regarded as the best evidence of its contents, depends upon circumstances. Some authorities hold that a telegram filed with the telegraph company is the best evidence, and that a copy may be put in evidence only upon a showing that the filed telegram is lost or destroyed or is beyond the jurisdiction of the court. *Smith Furniture Co.* v. *Peter & Volz,*

205 Ill. App. 379; *Smith & Whiting* v. *Easton,* 54 Md. 138, 39 Am. Rep. 355. On the other hand, the general rule is stated to be that, if the person sending the telegram takes the initiative and the telegram company considered to be his agent, the telegram delivered at its destination by the telegraph company to the sendee is regarded the original and the best evidence of its contents, if there is no dispute as to contents (note, 8 Ann. Cas. 270; 10 R. C. L. 910), and on proof that the telegram was sent, and as sent and delivered was lost or destroyed or was beyond the jurisdiction of the court or otherwise unavailable secondary evidence of its contents may be received. The same rule in such respect prevails in regard to telegrams as to other writings permitting secondary evidence of their contents when a proper foundation is laid that the original is lost or destroyed or otherwise cannot be produced. 2 Jones Comm. on Evid. (2d Ed.) 1471. That the copy here put in evidence was not the best evidence of the contents of the telegram is clear enough. The only foundation laid for its admission in evidence is this: Bennett having testified that he, after signing the order of November 21 and after talking over the telephone with the cashier of the Boise bank and on the morning of the 22d, sent a telegram to the sales agent canceling the order, counsel for the defendant inquired of counsel for the plaintiff. "Do you have in your possession a telegram dated November 22nd, 1928, from E. G. Bennett to E. A. Waugh (the sales agent)?" Counsel for the plaintiff replied, "We have not." Thereupon counsel for the defendant resumed his direct examination of Bennett and asked him if Exhibit 2 (a claimed copy of the telegram) was "a copy of the telegram to which you refer." The witness answered that it was, that it was a copy from his files and a copy of the telegram sent on the morning of November 22. The copy was thereupon offered and admitted in evidence over the objection of the plaintiff on the ground, among other grounds, that it was not the best evidence and that a proper foundation had not been laid to admit it. Thereafter the

witness further testified that on the evening of November 23 he had a conversation with the sales agent in Salt Lake City in which the agent asked him why he had canceled the order, to which the witness replied because of misrepresentations made by the agent that officers of the bank at Boise desired the goods, and that after the witness had signed the order he learned that the representations were not true; and that a meeting for the evening of November 23 was arranged over the telephone after the sales agent "had received my telegram." No claim is made that the telegram was directly sent to the plaintiff. The claim is that it was sent to the sales agent. No showing is made that the telegram or a copy thereof was transmitted to the plaintiff. On the contrary, evidence was given to show that the plaintiff had neither knowledge nor notice of any cancellation or modification of the order as given by the defendant on November 21, until the letter from Bennett on January 25, 1929, declining acceptance of the goods shipped to the Boise bank. No evidence was adduced to the contrary, nor any claim made, that any notice was given the plaintiff as to any cancellation or modification of the order, except the notice to or knowledge possessed by the sales agent and imputable to the plaintiff. In such circumstance mere inquiry of counsel for the plaintiff when the witness was on the stand whether the plaintiff had possession of a telegram sent by Bennett to the sales agent and counsel for the plaintiff replying that it had not, and without any showing of any kind that neither the telegram filed with the telegraph company nor the telegram transmitted and delivered to the sales agent could not be produced or was not available, in my opinion, was not the laying of a sufficient foundation to admit the copy in evidence, especially when no timely or reasonable notice was given the plaintiff to produce the telegram, if such a telegram was in the possession of the sales agent, or that its production was otherwise available to the plaintiff on reasonable notice to produce it. In other words, no attempt whatever was made by the defendant to

procure either the telegram claimed to have been filed with the telegraph company or the telegram claimed to have been transmitted and delivered to the sales agent, and no showing whatever made that neither was available to the defendant or could not be produced. It is said that, if error was committed in admitting the copy in evidence, no harm resulted, for the reason that there was other sufficient evidence to show that the order as to the goods to be shipped to the Boise bank was canceled or modified by the agreement made between Bennett and the sales agent on the evening of the 23d. One of the material questions as to plaintiff's cause was whether the cancellation or modification of the order was had before the order was accepted at the home office by the plaintiff and before it became a completed contract. If by competent evidence, it had been shown that the telegram in question was transmitted and delivered to the sales agent on the morning of the 22d, then it might well be argued that the order was canceled before the plaintiff, as shown by its testimony, had accepted the order. On the other hand, if the order was not canceled or modified until the evening of the 23d, then it is more doubtful whether the cancellation or modification was had before the order was accepted by the plaintiff on the 23d as shown by its evidence. The telegram, therefore, had considerable probative value in determining whether the order was or was not canceled or modified before the plaintiff had accepted it, and may have been one reason, even the chief reason, inducing the finding that the order was canceled before it was accepted by plaintiff. Though, on the record now before us, it be considered that erroneously admitting a copy of the telegram in evidence was not of prejudicial effect, still, on a retrial of the case, the copy of the telegram, unless a better foundation is laid for its admissibility, should not be admitted, and the trial court should so be advised.

There is still a further point on which I find it necessary to express views not in harmony with the prevailing opinion.

The point relates to the parol evidence rule with respect to the evidence received as to the character, experience, and qualifications of the operators to manage and conduct the campaigns. As is seen by the contract, the plaintiff agreed "to furnish an operator to manage purchaser's campaign," etc. The defendant, over the objection of the plaintiff, was permitted by parol to show the character, experience, and qualifications of the operators to be furnished. That, it is claimed, varied the terms of the contract, and hence was improperly received. I do not think so. The term "operator," as used in the contract, is not self-descriptive or explanatory. The term, as used in the contract, has no defined meaning in law, nor any popular or fixed meaning. It has rather a particular or special meaning as applied to the context or subject-matter to which it relates. How the parties regarded it, or understood the sense in which the term was used, can only be made evident by parol. To permit that is not to vary the terms of the contract itself, but only to explain the term and the sense in which the parties used the term and understood it. The evidence did not add anything to the contract itself; it only explained an undefined term. I thus think no error was committed in admitting the evidence in such particular. 22 C. J. 1109.

While, as indicated, I concur in the order reversing the judgment, I do not concur in the order that the case be remanded for a new trial only as to the counterclaim. I think the whole case should be remanded for a new trial with leave to the parties or to either of them to amend the pleadings as they may be advised. The judgment below was that the plaintiff take nothing by its complaint, that it be dismissed and the defendant given judgment against the plaintiff in the sum of $2,000. There was but one judgment and the appeal taken was from the whole of the judgment. The appeal involved the whole of the issues, those presented by the complaint as well as those presented by the counterclaim, and by assignments alleged errors are presented for review involving both. On a review and consideration of both, the

conclusion is reached that no prejudicial error was committed by the court below denying the plaintiff relief on its complaint, but that error was committed in awarding judgment in favor of the defendant on its counterclaim. By the prevailing opinion the court thus by a final adjudication sets at rest that portion of the judgment dismissing plaintiff's complaint and remands the other portion for a new trial. In view of the issues it is doubtful whether in a law case the court may properly do that. However, though such power be assumed, yet the wisdom or propriety of exercising it, on a review of assignments as here, is another thing. The power to make an order and the wisdom or propriety of exercising it in a given case involves two distinct functions. Here the foundation of plaintiff's cause, as presented by its complaint, as well as that of the defendant presented by its counterclaim, grew out of one and the same contract, the same transaction, the same subject of the action. The cause of action presented by the counterclaim was one falling within the provision of Comp. Laws Utah 1917, § 6576, subd. 1, "a cause of action arising out of the transaction set forth in the complaint as the foundation of the plaintiff's claim, or connected with the subject of the action." Were the case one where the plaintiff's cause rested upon one contract and the defendant's cause by counterclaim on another separate and distinct contract, I could see some basis justifying a splitting of the issues, rendering a final judgment of the one and a new trial of the other, for in such case there would be different transactions and different subject-matters. But where, as here, the cause of action presented by the complaint and that presented by the counterclaim arise out of the same transaction and connected with the same subject of the action, I do not see the propriety of a final adjudication of the one and the granting of a new trial as to the other—giving to the one two bites at the cherry and to the other but one. This is not a case where the plaintiff failed to prove his cause by sufficient evidence, nor where by the great or manifest weight

of the evidence the plaintiff was not entitled to prevail on the issue presented by its complaint, nor where the plaintiff in no event was entitled to prevail on such issue. As is seen, one of the material questions is as to whether by competent evidence it was shown that the order as to the goods to be manufactured and delivered to the Boise bank was modified and notice given the plaintiff before its acceptance of the order and before the order became a binding contract. Admittedly, the evidence with respect thereto is in direct conflict and of such character as to justify a finding either way, and hence there was sufficient evidence to justify the finding, though it be against the apparent preponderance of the evidence, that before acceptance of the order by the plaintiff, the order in the particular indicated was modified. If, on a new trial, the defendant may strengthen its cause on its counterclaim, it is not to be assumed that the plaintiff, if given an opportunity, may not also on a new trial strengthen its cause, or induce a finding in its favor on the issue presented by its complaint. Since the one party is given an opportunity to do so, I see no good reason why the other should not be given the same opportunity, especially since the point of law urged and relied on by the plaintiff in the court below, that after the order given and signed by the defendant had left the hands of the sales agent he had no authority to cancel or modify it, is on the appeal held against the plaintiff, that on a new trial it may be able to give further evidence which may induce a finding in its favor even on the theory of the defendant; and because the error admitting the copy of the telegram in evidence may have induced the finding that the order was canceled before it was accepted by the plaintiff.

I thus think justice is better reflected by remanding the whole cause for a new trial on all the issues.

EPRHAIM HANSON, Justice (dissenting).

The conclusion reached in the prevailing opinion creates an anomalous situation. This situation is, in my judgment,

wholly unnecessary, even though the action is one at law. The plaintiff's action is dismissed, notwithstanding its complaint is found sufficient in law and is supported by evidence which the prevailing opinion deems sufficient to have entitled it to a judgment had the triers of fact found in its favor. On the other hand, the counterclaim does not state facts sufficient to constitute a cause of action. The evidence received in support thereof is adjudged by the prevailing opinion to be wholly insufficient to sustain the judgment rendered for the defendant in the trial court, yet the cause is remanded to the district court for a new trial solely on the counterclaim. I think the judgment of the trial court should be reversed, and the cause remanded for a new trial. I therefore concur in the dissenting opinion of Mr. Chief Justice STRAUP.