**Knut EIE, Thomas Brown, and Rocky Mountain Paramedics, Plaintiffs and Appellants,**

v.

**ST. BENEDICT'S HOSPITAL and Robert K. Eisleben, Defendants and Respondents.**

No. 17195.

Supreme Court of Utah.

Nov. 2, 1981.

Stephen W. Farr, Ogden, Thomas D. Roberts, Salt Lake City, for plaintiffs and appellants.

Glen Mecham, Ogden, Craig Stephens Cook, Salt Lake City, for defendants and respondents.

HALL, Chief Justice:

Plaintiffs appeal a judgment of the lower court which denied them alleged damages for breach of contract.

Plaintiffs Eie and Brown are both paramedics, trained in California. In June, 1975, Eie approached defendant Eisleben (administrator of the St. Benedict's Hospital) about the possibility of establishing a paramedic base at the hospital. Eie pointed out to Eisleben how the hospital would benefit from such a program both in terms of public relations and additional patients. Eie represented that the charge for each paramedic call where emergency medical services were rendered would be $100. This representation was also part of plaintiffs' proposal to the Ogden City Council in September, 1975.

Under plaintiffs' proposal, the hospital would be required to invest approximately $20,000 in equipment for the base station; hence, the hospital was concerned about the financial status of the paramedics and the projected profitability of the operation. One John Doramus, the hospital's director of fiscal services, was given the assignment of working with Eie in projecting income and expenses of the proposed operation. During these negotiations, it was mutually decided that the operation would be better accepted by the community and by insurance carriers if a fee schedule for specific services were developed. Eie was cautioned, however, that in order for the operation to remain fiscally viable the average charge per call must be approximately $100.[1]

It was agreed that the hospital would bill for plaintiffs' services according to vouchers supplied by plaintiffs. It was also understood that in order to make the venture a profitable one for the hospital, it would keep ten percent of the total billings.[2]

In October, 1975, attorneys for both sides drafted proposed agreements. The proposed agreements were substantially similar but did contain some differences. As the start-up date for the operation approached and no contract had been agreed upon, Eisleben decided that the business relationship had to be spelled out in some way. On October 29, 1975, an "interim" letter agreement was drafted and signed by Eie and Eisleben. That letter was signed on the assumption that a final agreement would be forthcoming in a few days and read, in pertinent part, as follows:

Dear Mr. Eie:

This letter will serve as an interim agreement between Rocky Mountain Paramedics and St. Benedict's pending the final agreement being prepared by our attorneys.

The hospital is now and has for an extended period of time prior to the execution of this agreement, furnished general hospital services to Ogden City and surrounding communities. The Paramedics desire to provide emergency medical services in and for Ogden City and its surrounding communities. In the providing of these emergency medical services, the Hospital and the Paramedics do hereby agree to coordinate their services for the mutual benefit of themselves and the community, and do hereby agree to the following:

\*    \*    \*    \*    \*    \*

4. The Hospital will remit to the Paramedics, within 15 days of the end of each month, a remittance to the Paramedics in the amount of $90.00 per call, based on the number of MICU forms submitted to the billing office of the hospital for the previous month. This being subject to negotiation at six months intervals, and may, upon the agreement of the parties, be renegotiated.

Several days after the "interim agreement" was signed, plaintiffs submitted a "proposed fee structure" to the hospital for its approval. A revised fee schedule was ultimately prepared and agreed upon by the hospital as of November 17, 1975. As the paramedic service got underway, it became evident that the average charge per call would not even approach $100. Consistently throughout the parties' relationship, the hospital remitted to plaintiffs not $90 per call, but 90% of the total amount billed for paramedic services. Although plaintiffs were allegedly upset about receiving less than anticipated for the services rendered, the believable evidence adduced at trial was that the checks were accepted without protest.

Plaintiffs continued to operate the paramedic service in such a manner for well

---

1. This was based on statistical information supplied by Eie that plaintiffs would average six calls per day.

2. Plaintiffs do not concede this point; however, the record does contain testimony to this effect.

This Court must review the evidence in the light most favorable to the lower court's findings. *Hove v. McMaster*, Utah, 621 P.2d 694 (1980); *Berkeley Bank for Coops. v. Meibos*, Utah, 607 P.2d 798 (1980).

over one year, until February, 1977. Thereafter, demands were made upon the hospital by plaintiffs for amounts allegedly due under the $90-per-call provision. When these demands were not met, suit was filed wherein plaintiffs demanded $61,532.44 as unpaid services and $100,000 as consequential damages. Defendants filed an answer and counterclaim for malicious use of process.

The matter was tried to the court and a decision was rendered on February 9, 1979. Because of various objections of the parties to the court's findings, the ultimate findings of fact and conclusions of law and judgment were not entered until June 20, 1980. The court found as follows:

1. That the parties negotiated for a contract whereby plaintiffs would perform paramedic services under the direction of physicians at defendant Hospital.

2. That the contract in the true meeting of the parties' minds was that 90% of plaintiffs' billings would be remitted to plaintiff by defendant, and defendant would retain 10% thereof to cover the costs of billing and the administration of the accounts.

3. The $90.00 amount was written into the interim contract upon the presupposition by both parties that the plaintiffs' billings would be on a $100.00 flat fee basis, and the $90.00 was intended to represent 90%.

4. There is insufficient evidence to support the defendants' counterclaim.

5. That at the close of the evidence at trial, there was not sufficient evidence upon which the Court could determine whether there were amounts due under Findings of Fact numbered 1, 2 and 3, and the Court invited the plaintiff to re-open the case for such evidence. Upon said re-opening, the parties stipulated that the amounts due plaintiff from defendant on the basis of "90% of billings" was the sum of $2,225.00.

On appeal, plaintiffs contend that inasmuch as "reformation" and "mutual mistake" were not affirmatively pleaded, the trial court could not base its decision on those issues. As a preliminary matter, it seems clear from the findings that the lower court did not base its decision on reformation or mutual mistake;[3] rather, the basis of the court's decision was that the contract was not an integrated agreement, as discussed *infra*. Nevertheless, it is true that affirmative defenses must be set forth by the party so pleading.[4] In their answer, defendants asserted the following defenses: (1) the complaint failed to state a cause of action upon which relief may be granted; (2) defendants were fraudulently induced to enter into the agreement by plaintiffs' representation that they would charge $100 per call; (3) plaintiffs accepted from defendants payments for their billings at the rate of 90%, which gives rise to the defense of estoppel; and (4) breach of the agreement on the part of plaintiffs.

We are convinced that the foregoing adequately raised the issues addressed by the court. *Cheney v. Rucker*[5] makes the following observations with respect to raising issues:

It is true, as plaintiff insists, that Rule 8(c), U.R.C.P., requires that affirmative defenses be pleaded. It is a good rule whose purpose is to have the issues to be tried clearly framed. But it is not the only rule in the book of Rules of Civil Procedure. They must all be looked to in the light of their even more fundamental purpose of liberalizing both pleading and procedure to the end that the parties are afforded the privilege of presenting whatever legitimate contentions they have pertaining to their dispute. What they are entitled to is notice of the issues raised and an opportunity to meet them. When this is accomplished, that is all that

---

3. Because we do not view the case as involving mutual mistake, we do not address plaintiffs' claim that "reformation of the contract is not justified because of any mutual mistake of the parties."

4. Rule 8(c), U.R.C.P.

5. 14 Utah 2d 205, 381 P.2d 86 (1963).

is required. Our rules provide for liberality to allow examination into and settlement of all issues bearing upon the controversy, but safeguard the rights of the other party to have a reasonable time to meet a new issue if he so requests. Rule 15(b), U.R.C.P., so states. It further allows for an amendment to conform to the proof after trial or even after judgment, and indicates that if the ends of justice so require, "failure so to amend does not affect the result of the trial of these issues." This idea is confirmed by Rule 54(c)(1), U.R.C.P.: "[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." [Citation omitted.]

The court's decision is entirely consistent with the issues raised by the pleadings and there can be no surprise claimed by either party.[6]

■ Plaintiffs next contend that the trial court erred in admitting parol evidence as to the circumstances surrounding the interim agreement. The general rule is that in the absence of fraud, an apparently complete and certain agreement which the parties have reduced to writing will be conclusively presumed to contain the whole agreement; and that parol evidence of contemporaneous conversations, representations or statements will not be received for the purpose of varying or adding to the terms of the written agreement.[7] The foregoing general rule applies only to *integrated* contracts. Whether parol evidence is admissible therefore depends upon whether we are dealing with an integrated writing. The following language from the case of *Bullfrog Marina, Inc. v. Lentz*[8] is most enlightening:

Section 228, Restatement, Contracts, states:

An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted.

Comment a. of Section 228 explains that integrated contracts must be distinguished from written memoranda by which contracts may be proved. An essential element of an integration is that the parties shall have manifested assent not merely to the provisions of their agreement but to the writing or writings in question as a final statement of their intentions as to the matters contained therein. Whether a document was or was not adopted as an integration may be proved by any relevant evidence.

Whenever a litigant insists that a writing that is before the court is an integration and asks that application of the parol evidence rule, the court must determine as a question of fact whether the parties did in fact adopt a particular writing or writings as the final and complete expression of their bargain. In determining the issue of the completeness of the integration in writing, evidence extrinsic to the writing itself is admissible. Parol testimony is admissible to show the circumstances under which the agreement was made and the purpose for which the instrument was executed. [Citations omitted.]

■ Clearly, the parties did not intend the letter of October 29 to be the final agreement between them. By its very terms, it is "an interim agreement . . . pending the final agreement being prepared by our attorneys." The believable evidence adduced at trial supports the claim that the letter was intended to be only a tentative agreement. The court therefore properly considered parol evidence.

■ Defendants contend that there is no substantial evidence to support the finding that the plaintiffs were to be paid 90% of

---

**6.** Plaintiffs themselves filed with the court prior to trial a memorandum of authorities which addressed such issues as subsequent modification, waiver and estoppel.

**7.** *B. T. Moran, Inc. v. First Security Corp.*, 82 Utah 316, 24 P.2d 384 (1933).

**8.** 28 Utah 2d 261, 501 P.2d 266 (1972).

the billings and that $90 was written into the contract on the presupposition of a $100 flat fee to be charged by the plaintiffs. Contrary to this contention, there is substantial evidence to support the court's findings.

Exhibits admitted at trial include *pro forma* income statements prepared by plaintiffs which contemplated a hospital billing fee of ten percent. Also, the draft of a contract to provide billing service stated that the billing would be done for a fee of ten percent per call, and that the remittance to plaintiffs would be computed at $90 per call. Obviously, these two paragraphs would have been inconsistent were it not considered that $100 would be charged per call.

At the time of the October 29 letter, plaintiffs had not submitted any schedule of their proposed fee structure. It was not until November 4 that a proposed fee structure was submitted. The finalized fee structure did not appear until November 17. At the time the interim agreement was drafted, it was therefore not unreasonable for the hospital to assume that the charges would average $100 per call as had been discussed.

Doramus testified that Eie told him that even under the later-proposed fee structure, the average charge would be about $100. Doramus told Eie to insure fiscal stability by setting the fee schedule high enough so that billings would average $100 per call.

Finally, the course of dealing of the parties gives some indication of their intentions. Throughout the entire time the agreement was in force, the hospital reimbursed to plaintiffs 90% of the bill. At no time did it pay a flat $90 fee. Furthermore, plaintiffs made no protest until after the contractual relationship was terminated in February, 1977. Though arguably clear on its face, where the parties demonstrate by their actions that to them the contract meant something quite different, the intent of the parties will be enforced.[9]

The findings and judgment of the trial court are adequately supported by the record and we therefore do not disturb them.

Affirmed. Costs to defendants.

STEWART, HOWE and OAKS, JJ., concur.

MAUGHAN, J., heard the arguments, but died before the opinion was filed.

---

9. *Bullfrog Marina v. Lentz, id.*, citing *Bullough* v. *Sims*, 16 Utah 2d 304, 400 P.2d 20 (1965).