1999 UT 62

**J. Rodney DANSIE, Plaintiff and Appellant,**

v.

**HI–COUNTRY ESTATES HOME-OWNERS ASSOCIATION, a Utah non-profit corporation, Defendant and Appellee.**

No. 970517.

Supreme Court of Utah.

June 22, 1999.

Rehearing Denied Oct. 6, 1999.

George A. Hunt, Salt Lake City, for plaintiff.

A. Howard Lundgren, Sheleigh A. Chalkley, Salt Lake City, for defendant.

HOWE, Chief Justice:

¶ 1 Plaintiff J. Rodney Dansie appeals from a judgment in this declaratory judgment action that his eighty acres of real property were subject to the covenants, conditions, and restrictions which had been imposed on an adjacent subdivision, the Hi–Country Estates Phase I Subdivision (the "Subdivision" or "Phase I"), and that his property was subject to assessments made by defendant Hi–Country Estates Homeowners Association (the "Association").

## BACKGROUND

¶ 2 Dansie owns two forty-acre parcels of real property (collectively, the "Property") located in southwest Salt Lake County, Utah. These parcels abut the Subdivision to the south and west; specifically, these parcels are described as the southwest quarter of the southwest quarter (the "westerly parcel") and the southeast quarter of the southwest quarter (the "easterly parcel") of section 5, township 4 south, range 2 west, Salt Lake Base and Meridian. Dansie also owns two lots within the Subdivision—lots 43 and 51.

¶ 3 In 1970, Gerald H. Bagley, Charles Lewton, and Keith Spencer (the "developers") began to develop the Subdivision. At that time, they recorded a "Declaration of Protective Covenants" for the Subdivision. Soon afterwards, Dansie became aware of the planned Phase I development following the erection of a sign announcing the Subdivision's development. Dansie then met the developers in connection with negotiations for an agreement between them and Dansie's father to provide water to the Subdivision. Dansie also reviewed a sales brochure which indicated lot sizes and prices and described the Subdivision as a private community, accessible through an electronic gate. In early 1973, Lewton organized the Association, a Utah non-profit corporation, and filed a certificate of incorporation. According to the certificate of incorporation, the purpose of the Association was

> to provide for maintenance, upkeep and preservation of the streets, roads and common area within [the Subdivision] and also to ... promote the health, safety and welfare of the residents within [the Subdivision] and any additions thereto as may hereafter be brought within the jurisdiction of this Association ... .

¶4 In December 1973, Lewton and an entity described as "Hi–Country Estates Second" sold to Bagley, under a written contract, five forty-acre parcels of land adjacent to the Subdivision that included the Property. In this real estate contract (the "1973 Contract"), Bagley received the right to use the Association's roads in the Subdivision for access to the property he was purchasing. In return, Bagley would become a member of the Association and pay a proportionate share of the costs of road maintenance and other services. Although the 1973 Contract's terms specifically bound Bagley's assigns and successors, it was not recorded in the Salt Lake County Recorder's Office.

¶5 In 1977, Bagley hired Dansie as a contractor to assist with the development and maintenance of the Subdivision's water system, by digging water lines, making connections, and repairing pumps. Acting in that capacity, Dansie aided in the placement and installation of a 40,000–gallon water tank on the westerly parcel in 1978.

¶6 Dansie acquired lots 51 and 43 within the Subdivision in 1984 and 1985, respectively. In November 1985, Bagley conveyed the westerly parcel to Dansie by warranty deed. Prior to that conveyance, however, Bagley had executed a trust deed in favor of United Bank, whose successor foreclosed on the westerly parcel in February 1989 (the "foreclosure") and later sold it to Fidelity National Insurance Company. With Dansie's aid, his in-laws, Paul G. and Ida F. Evans (the "Evanses"), purchased the westerly parcel at a public sale in March 1989. The Evanses ultimately conveyed the westerly parcel to Dansie in 1993 as part of a divorce settlement between Dansie and their daughter. In 1989, Bagley's attorney, Ralph Marsh, conveyed the easterly parcel to Dansie. None of the aforementioned deeds to the Property made any reference to any covenants, conditions, or restrictions on the Property, nor did any appear in the Property's chain of title.

¶7 In 1986, prior to the foreclosure, Dansie conveyed the westerly parcel and lot 43 in the Subdivision to himself and his wife by a quit-claim deed to create a joint tenancy in the parcels. This quit-claim deed describes the property conveyed as:

PARCEL ONE:

The Southwest Quarter of the Southwest Quarter of Section 5, Township 4 South, Range 2 West, Salt Lake Base and Meridian.

PARCEL TWO:

ALL OF Lot 43, HI–COUNTRY ESTATES, according to the official plat thereof on file in the Office of the Salt Lake County Recorder, State of Utah.

TOGETHER WITH a right-of-way over and across and [sic] the private roads located within said subdivision.

SUBJECT TO covenants, conditions, and restrictions on HI–COUNTRY ESTATES, as recorded in Book 3541, Page 68, Entry No. 2607748, Official Records, and the Rules and Regulations of the HI–COUNTRY ESTATES Homeowner's Association.

ALSO SUBJECT TO restrictions, rights-of-way, and easements appearing of record or enforceable in law and equity.

¶8 In 1990, the Association began sending the Evanses assessment notices for the westerly parcel. Dansie acted as their agent and attempted to ascertain the reason for the Association's attempted collection of assessments on a parcel outside the boundaries of the Subdivision. While the Association had previously assessed Dansie for lots 43 and 51 in the Subdivision, and while he was aware of the specific breakdown of the Association's assessments, he had not received assessment notices on the westerly parcel at any time he had owned the parcel prior to the foreclosure. In November 1991, Backman–Stewart Title Services, Ltd., paid the "1991 Association assessment, gate repair fee plus interest, penalties and fees" on Dansie's behalf, although the payment was made under Dansie's protest.

¶9 The Association continued in its attempts to collect fees and assessments on the Property from Dansie. In response to these repeated attempts, Dansie filed this declaratory judgment action against the Association, seeking a determination that he was entitled to an easement either by prescription and/or implication across the roads of the Subdivi-

sion, and that the Subdivision's covenants, conditions and restrictions ("CC&Rs") and the Subdivision's "right to make such assessments [pursuant to the CC&Rs] is limited as a matter of law against property located within the physical boundaries" of the Subdivision and not against the Property. The Association counterclaimed, seeking a judgment against Dansie for all unpaid assessments, interest on the assessments, and attorney fees, alleging that under the 1973 Contract, Dansie was a member of the Association and was therefore subject to the Subdivision's CC&Rs and was also subject to all corresponding fees and assessments.

¶ 10  At trial, the court dismissed with prejudice Dansie's claim for a prescriptive easement and for declaratory relief. Also, the court declared Dansie's claim for an implied easement "effectively mooted by the judgment." On the counterclaim, the trial court determined: (1) the quit-claim deed unambiguously imposed both the Association's CC&Rs on the westerly parcel and Association membership on Dansie; (2) both parcels were subject to the Association's CC&Rs by virtue of Dansie's actual notice of the CC&Rs; and (3) Dansie was thereby bound to pay all assessments and fees as required by Association membership. The court awarded the Association judgment for all past assessments and fees, including interest and attorney fees. Dansie now appeals.

### ANALYSIS

¶ 11  Dansie assigns as error the trial court's conclusions that (1) the quit-claim deed subjected the westerly parcel to the CC&Rs and imposed Association membership on Dansie; (2) Dansie had knowledge, either constructive or actual, of the CC&Rs, which subjected the Property to them even though they were not in the chain of title to the Property; and (3) the Association's bylaws (the "By-laws") required Dansie to pay the Association's attorney fees in this action.

### I.  THE QUIT–CLAIM DEED

■ ¶ 12  Dansie contends that the trial court erred in concluding that the quit-claim deed subjected the westerly parcel to the

Subdivision's CC&Rs that had been imposed earlier on the Subdivision. As set out above, the deed conveyed two parcels of land. Parcel One was the westerly parcel. Parcel Two was lot 43, HI–COUNTRY ESTATES, a lot in the Subdivision. Following the description of lot 43, there were three qualifying paragraphs as follows:

TOGETHER WITH a right-of-way over and across and [sic] the private roads located within said subdivision.

SUBJECT TO covenants, conditions, and restrictions on HI–COUNTRY ESTATES, as recorded in Book 3541, Page 68, Entry No. 2607748, Official Records, and the Rules and Regulations of the HI–COUNTRY ESTATES Homeowner's Association.

ALSO SUBJECT TO restrictions, rights-of-way, and easements appearing of record or enforceable in law and equity.

■ ¶ 13  The Association correctly characterizes the three qualifying paragraphs as the habendum clause of the deed whose purpose is to curtail, limit, or qualify the estate conveyed in the granting clause. *See Haynes v. Hunt*, 96 Utah 348, 353, 85 P.2d 861, 863 (1939). However, the issue in the instant case is whether this habendum clause qualifies both parcels or only Parcel Two. The trial court interpreted the "SUBJECT TO" and the "ALSO SUBJECT TO" paragraphs to apply to both Parcels One and Two. This was error for the following reasons.

¶ 14  First, the drafter of the deed clearly intended to deal with the two parcels separately as evidenced by labeling them "Parcel One" and "Parcel Two." All three of the qualifying paragraphs appear under the heading "PARCEL TWO," clearly indicating that they apply only to lot 43. They do not appear under the heading "PARCEL ONE." From the date of the Subdivision's creation, lot 43 was subject to the CC&Rs. Every succeeding conveyance of a Subdivision lot would have properly indicated that the lot was subject to the CC&Rs. However, Parcel One had not theretofore been subjected to the CC&Rs because it lay outside the Subdivision. The "Declaration of Protective Covenants" referred to in the deed expressly imposed the CC&Rs only on the Subdivision.

We should not lightly assume that they could be also imposed on adjoining property such as Parcel One without a clear expression of intent by the owner to do so. That was not done here. "[R]estrictive covenants are not favored in the law and are strictly construed in favor of the free and unrestricted use of property." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 198 (Utah 1991) (citing *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah 1982); *Freeman v. Gee*, 18 Utah 2d 339, 345, 423 P.2d 155, 159 (1967); *Parrish v. Richards*, 8 Utah 2d 419, 421, 336 P.2d 122, 123 (1959)).

¶ 15 Second, if we determine that the "SUBJECT TO" and the "ALSO SUBJECT TO" paragraphs apply to Parcel One as the trial court did, then by the same reasoning we must conclude that the preceding qualifying paragraph reading "TOGETHER WITH a right-of-way over and across and [sic] the private roads located within said subdivision" must also apply to Parcel One. That reading would obviously be erroneous because it would amount to Dansie unilaterally granting to himself and his wife a right-of-way over the Subdivision's roads for the benefit of Parcel One without the consent of the Association that owned the roads. A right-of-way cannot be created in that manner.

¶ 16 For the foregoing reasons, we reverse the trial court's conclusion that the quit-claim deed imposed the CC&Rs on the westerly parcel.

## II. ACTUAL AND CONSTRUCTIVE NOTICE OF THE CC&Rs

### A. Notice

¶ 17 Dansie next assigns as error the trial court's conclusion that the Property was subject to the Subdivision's CC&Rs because of Dansie's actual and constructive notice that it had been the Subdivision's developers' intention to impose the CC&Rs on any additional phases of the Subdivision, including the Property adjoining the Subdivision. The Association relies largely upon the 1973 Contract. In that contract, Bagley received the right to use the Association's roads in the Subdivision for access to the property he was purchasing. In return, the contract required

Bagley to become a member of the Association and pay a proportionate share of the costs for road maintenance and other services.

¶ 18 The Association concedes that there is no document that specifically imposes the CC&Rs on the Property. The "Declaration of Protective Covenants," recorded in 1970 by the developers, specifically imposed the CC&Rs only on the Subdivision. While it may well have been the intent of the developers to impose the covenants on additional phases of the Subdivision which might be developed later, that was never done by a written instrument. Moreover, even if Dansie had notice or even knowledge of the developers' intent and knew of the obligation to subject the Property to the CC&Rs that the 1973 Contract imposed upon Bagley, Dansie was not a party to that contract, nor is it contended that he is a successor or assign of that contract so as to be bound by its terms. The Association cites no legal authority that would obligate Dansie to burden the Property with the CC&Rs simply because he had notice of the intent of the original developers and knowledge of the 1973 Contract. In neither of the deeds by which Dansie acquired title to the Property was there any attempt to burden the Property with the CC&Rs. Dansie acquired the Property free of all covenants, conditions, and restrictions. He cannot be bound by the intent of prior owners to subject the Property to the CC&Rs.

### B. Merger

¶ 19 There is an additional reason why the Property is not burdened by either a membership requirement or the associated CC&Rs. Dansie contends that even assuming the 1973 Contract *did* impose the CC&Rs, "the contract terms merged into subsequent deeds conveying the property and were therefore extinguished as a matter of law." The generally accepted rule dealing with merger supports Dansie's position "that on delivery and acceptance of a deed the provisions of the underlying contract for the conveyance are deemed extinguished or superseded by the deed." *Secor v. Knight*, 716 P.2d 790, 792 (Utah 1986) (citations omitted).

However, the Association correctly points out that there are exceptions to the application of merger. We agree that exceptions to this doctrine exist, "including fraud, mistake, and the existence of collateral rights in the contract of sale." *Secor*, 716 P.2d at 793. The Association argues that the collateral rights exception applies in this case. We disagree with this argument.

¶ 20 If the original contract requires the seller to perform an act considered to be collateral to the conveyance of title, those obligations are not extinguished but instead survive the deed. *Stubbs v. Hemmert*, 567 P.2d 168, 169 (Utah 1977). In *Stubbs*, this court indicated that a determination of whether contract terms were either collateral or part of the obligation to convey title depended to a great extent on the intent of the parties. *Id.* There, we examined contract terms allowing a vendor to remove certain equipment and personal property from a building at a time *after* delivery of the deed. We determined that these contract terms were, in fact, collateral, stating:

> When seller's performance is intended by the parties to take place at some time after the delivery of the deed it cannot be said that it was contemplated by the parties that delivery of the deed would constitute full performance on the part of the seller, absent some manifest intent to the contrary.

*Id.* at 169–70. The Association argues that under *Stubbs* the language of the 1973 Contract is not extinguished by the later deeds because the "1973 Contract requires the buyers to become members of the Homeowners Association at some point after the signing of the Contract ..., it contemplates performance after the delivery of the deed, and constitutes a collateral agreement."

¶ 21 However, nearly a decade after *Stubbs*, this court clarified the collateral rights standard, holding that "covenants relating to title and encumbrances are not considered to be collateral because they relate to the same subject matter as does the deed." *Secor*, 716 P.2d at 793 (citation omitted). The contract language relied on by the Association here is clearly a "covenant[ ] related to title and [an] encumbrance[ ]" upon the

title to the Property. The CC&Rs burden the title. The 1973 Contract's language clearly intends *membership in the Association* to be required simultaneously with the passing of title to the Property. A duty to pay maintenance fees and other monetary assessments and to comply with the Subdivision's CC&Rs is a fundamental element of Association membership. Therefore, it cannot be said that this duty exists collateral to the title or that it does not "relate to the same subject matter as does the deed." *Id.* Without express language imposing the membership requirement in the later deeds, the requirement in the contract merged with the later deeds, and has thereby been extinguished.

¶ 22 In sum, Dansie's actual or constructive notice of the intent of his predecessor in title does not impose Association membership on him or the Subdivision's CC&Rs on the Property.

## III. IMPLIED EQUITABLE SERVITUDES

¶ 23 In the alternative, the Association contends that we can affirm the trial court's judgment under the theory of implied equitable servitude. The Association relies on a Maine case holding that an implied equitable servitude may be imposed where the evidence establishes

> (1) a common owner subdivides property into a number of lots for sale; (2) the common owner has a "general scheme of development" for the property as a whole, in which the use of the property will be restricted; (3) the vast majority of subdivided lots contain restrictive covenants which reflect the general scheme; (4) the property against which application of an implied covenant is sought is part of the general scheme of development; *and* (5) the purchaser of the lot in question has notice, actual or constructive, of the restriction.

*3W Partners v. Bridges*, 651 A.2d 387, 389 (Me.1994) (emphasis added) (quoting *Chase v. Burrell*, 474 A.2d 180, 181 (Me.1984)).

¶ 24 It is readily apparent that even the first *3W Partners* requirement cannot be

met. The Property has never been subdivided nor offered for sale as individual lots. In *Hayes v. Gibbs,* 110 Utah 54, 169 P.2d 781 (1946), we imposed a building restriction on the defendant's lot where the restriction appeared in ninety-five percent of the deeds to the subdivision's lots. There, the defendant had notice of the restriction that appeared in his chain of title. The instant case presents a far different fact situation.

¶ 25 It is a long-standing, well-accepted requirement that covenants are to be embodied in a written instrument bearing the covenantor's signature. *See* 9 *Richard R. Powell on Real Property* § 60.03 (1998). Admittedly, there are certain instances where covenants can be imposed by implication, such as "from the language of a deed or lease or from the conduct of the parties." *St. Benedict's Dev. Co.,* 811 P.2d at 198 (citing 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 173 (1965)). Those instances, however, are extreme, and, "[a]s a general rule, ... not favored in the law." *Id.* (citing 20 Am.Jur.2d § 12; *Brown v. Safeway Stores, Inc.,* 94 Wash.2d 359, 617 P.2d 704 (1980)). For such a covenant to be impliedly imposed on property, "the support for it must be 'plain and unmistakable' or it must be 'necessary' as a matter of law." *Id.* (quoting 20 Am.Jur.2d § 173).

¶ 26 In the instant case, the Subdivision's developers placed the CC&Rs by written instrument on Phase I alone. The developers' written, signed, and recorded Protective Covenants expressly limit their application to "the described property," which is Phase I. Furthermore, while the Association's certificate of incorporation refers to "any addition[al property] as may hereafter be brought within the jurisdiction of th[e] Association," the Property has never either been part of Phase I or been brought under the Association's purview. Therefore, if Association membership—with its corresponding fees, assessments, and CC&Rs—as is currently imposed upon Phase I lot owners is to be impliedly imposed upon the Property, it must be done in plain and unmistakable language. That has not been done here; thus, the Association's theory of implied equitable servitudes is not applicable here.

## IV. ATTORNEY FEES

¶ 27 The By-laws, after setting forth the assessments for which each member is responsible, dictate:

> If the assessment is not paid within thirty (30) days after the due date, ... the Association may bring an action at law against the owner personally obligated to pay the same or foreclose the lien against the property, and interest, costs, and reasonable attorney[ ] fees of any such action shall be added to the amount of such assessment.

¶ 28 As we have found that the Property is not subject to Association membership, the Association cannot recover from Dansie the attorney fees the By-laws impose. While Dansie *is* a member of the Association by virtue of his ownership of two lots within the Subdivision, that cannot make him liable for attorney fees arising from a suit involving property *outside* of the Association's purview.

¶ 29 The judgment below is reversed and the case is remanded for determination of Dansie's claim of an easement across the Association's property.

¶ 30 Associate Chief Justice DURHAM, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE's opinion.