2002 UT 24

Melvin SPEARS, Sandy Spears, Freddie Martinez, Karen Martinez, Cliff Ruben, Tonja Ruben, Wayne D. Lewis, Miriam Lewis, Heidi Thomas, and Wayne V. Reynolds, Individuals, Plaintiffs and Appellees,

v.

Edward C. WARR and Hazel Warr, Defendants and Appellants.

No. 20000435.

Supreme Court of Utah.

March 8, 2002.

744

Anthony L. Rampton, Marci Batty Rechtenbach, Salt Lake City, for plaintiff.

Denise A. Dragoo, Todd M. Shaughnessy, Erik G. Davis, Salt Lake City, for defendants.

WILKINS, Justice.

¶ 1 This case involves a dispute over irrigation water rights, particularly whether water rights were paid for as part of a transfer of land and should have been conveyed, or whether the water rights were promised to be transferred as a separate transaction for additional consideration. The trial court concluded that the plaintiffs paid for the water rights at the time they paid for the lots, and that the parties agreed that the water rights would be transferred subsequent to the land

transaction. We affirm the judgment of the trial court.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶ 2 On appeal from a bench trial, "findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a); *Tanner v. Carter*, 2001 UT 18, ¶ 2, 20 P.3d 332. Accordingly, we relate the facts granting due deference to the trial court's resolution of factual disputes. *Tanner*, 2001 UT 18 at ¶ 2, 20 P.3d 332.

¶ 3 This dispute arises from the sale of land by defendants Edward C. Warr and Hazel Warr ("the Warrs"). The Warrs purchased approximately 110 acres of land in Tooele County, subdivided it, and then sold five-acre parcels. Plaintiffs Melvin and Sandy Spears, Freddie and Karen Martinez, Heidi Jo Thomas,[1] and Wayne V. Reynolds purchased their lots directly from the Warrs. The other plaintiffs, Wayne D. and Miriam Lewis and Clifford and Tonja Ruben did not receive title directly from the Warrs. Instead, the Lewises received their lot from Howard and Lora Lee Crittenden, who purchased the lot from the Warrs; and the Rubens, although they bargained with the Warrs, received their lot from Cathy Warr Johnson who received the lot from the Warrs.

¶ 4 In addition to the land, the Warrs also owned a 40% interest in irrigation water from Rose Spring that they planned to use to irrigate the subdivision. Their use of the water was protested by a neighbor, Max Bleazard. Bleazard filed suit in April 1987, and in defense of that claim, the Warrs filed an affidavit, which states:

3. We filed [an application] with the Utah State Engineer to change the point of diversion, place and nature of use ... to facilitate the use of such water for irrigation, domestic and stock watering uses on our property and on the Rocky Top Subdivision....

....

8. We subdivided and platted the Rocky Top Subdivision with the intent of selling platted plots with water developed from our interest in the Rose Spring, in reliance on the State Engineer's Memorandum Decision of November 2, 1984.

9. We have sold six of the eleven lots in the Rocky Top Subdivision upon our representation that gravity flow irrigation water would be provided to such lots from our interest in the Rose Spring.

10. Due to the pending quiet title action concerning the Rose Spring filed by Dale Max Bleazard, J.N. Ward Engineering has been unable to construct the planned metering and diversion system for the Rose Spring and we have been unable to provide gravity flow irrigation water through such facilities to the Rocky Top Subdivision.

At some point the Warrs received rights to ".99 cfs or 24.8% of the flow" of the spring.

¶ 5 From 1986 to 1997, the plaintiffs received title to their respective lots by warranty deed. During the negotiating process each plaintiff understood, based on the Warrs' representations to them, that irrigation water rights were included as part of the purchase price of the lots.[2] However, the deeds conveying title to the lots did not convey irrigation water rights. According to the Warrs, irrigation water rights were not paid for as part of the purchase price of the lots because they were not part of the agreement, and, consequently, not conveyed at the time of closing because ownership of the water was in dispute with Bleazard. Re-

---

1. The trial court found that "the Warrs sold Lot 8 of the Rocky Top Subdivision to Gary R. Thomas and Heidi Jo Thomas ... [but][t]he Warranty Deed conveying Lot 8 listed only Gary Thomas as a grantee...." Heidi Thomas is the party in interest because, although the lot was initially conveyed to her former husband, Gary Thomas, he conveyed his interest in the lot to her as part of their divorce decree.

2. The Rubens' lot was deeded to them by the Warrs' daughter, Cathy Warr, who held title to the property. However, the Rubens' dealt with Edward and Hazel Warr, who represented that they were the sellers and that irrigation water would be provided as part of the purchase price of the lot.

gardless, after the lots were purchased, plaintiffs repeatedly asked why the water rights had not yet been provided. In response, the Warrs indicated that the water rights could not yet be transferred because of the Bleazard dispute, because the pipeline was not yet finished, or because the deeds were still being prepared. Nevertheless, prior to 1995, the Warrs assured plaintiffs that they intended to provide the water as soon as possible.

¶ 6 After the Bleazard dispute was, to a certain extent, resolved, the Warrs began installing an underground pipeline to channel the Rose Spring irrigation water to the lots.[3] Some of the plaintiffs helped pay for and participated in the physical installation of part of the pipeline. Then, in 1994, after the Warrs had entered into a conditional agreement with Bleazard, they began conveying water rights to their children who owned lots in the subdivision. Though the Warrs conveyed deeds for water to their children, they did not convey deeds to the plaintiffs. Instead, the Warrs requested additional money, $2,500 to $5,000, to deed plaintiffs the irrigation water rights.[4] The plaintiffs, however, refused to pay additional money for the water rights, contending instead that they had already paid for the irrigation water rights as part of the purchase price of their lots.[5]

¶ 7 On September 4, 1996, the Warrs sought an extension of time from the State Engineer to put the water to beneficial use, and in so doing stated:

We are in the process of upgrading the "source" water line in order to use 100 percent of water rights. We need additional time to accomplish upgrading the source line (currently 4″) to a new 12″ line. The line is estimated to be approximately one mile in length requiring upgrade. The "place of use" water lines have been developed.

On September 23, 1998, the Warrs sought another extension of time from the State Engineer. In support of their request they stated:

Some water being used through railroad pipeline. Larger line from Rose Spring may be needed to convey all water under this change. Am currently pursuing change applications to take some water from wells in lieu of springs. Additional time is needed to fully develop water from spring or transfer rights to the wells.

¶ 8 Plaintiffs filed suit in January 1999, claiming specific performance, demanding that the Warrs convey irrigation water rights to them, and alternatively requesting damages. Following a three-day bench trial in March 2000, the district court ruled for the plaintiffs, ordering the Warrs to convey to plaintiffs by quitclaim deed "sufficient water from their interest in the Rose Spring to irrigate each of their five-acre lots, i.e., 0.079 cfs for each lot." Defendants appeal.

¶ 9 The essence of the Warrs' argument is that they never intended, nor did the parties agree, that irrigation water rights would be conveyed as part of the original land transaction. The Warrs claim they intended to obtain rights to the irrigation water later, after

---

**3.** Although Bleazard's complaint against the Warrs was dismissed on October 9, 1990, it was dismissed without prejudice, and Bleazard continued to threaten the Warrs with legal action until approximately 1993.

**4.** Melvin Spears, Freddie Martinez, Wayne Reynolds, and Hazel Warr all testified that sometime in 1995 the Warrs offered to sell the irrigation water quitclaim deeds to the plaintiffs. Ms. Thomas testified that it was in October 1995, when Ms. Warr told her that the irrigation water quitclaim deeds would cost an additional $2,500 and Ms. Thomas replied that she "was willing to pay the costs that were incurred in doing the paperwork [of preparing the deeds], but [the Warrs] didn't tell [her] that there was going to be a $2,500 cost on this." The Rubens learned from

Ms. Thomas sometime later that the Warrs were requesting $2,500 for the deeds.

**5.** Howard Crittenden, the initial owner of the Lewises' lot, was asked by Mr. Warr to pay an additional $2,500 for the water rights. The Crittendens objected to paying an initial amount for a deed, believing that the water rights were included in the price of the lot. The Crittendens sold the lot to Wayne D. and Miriam Lewis in 1997. Later, in 1999, the Lewises received, by quitclaim deed, any and all water rights which the Lewises had in the lot.

The Warrs never contacted the Rubens about the purchase of quitclaim deeds. Regardless, the Rubens learned of the Warrs' plan from Heidi Thomas and never paid additional money to the Warrs for a quitclaim deed to the water rights.

the Bleazard litigation was resolved, and then convey the water rights by another deed for an additional sum. The plaintiffs maintain that they and the Warrs understood that the purchase price of the lots included irrigation water rights, and they relied on the Warrs' representations to provide water when they bought their lots. In presenting their positions, the parties have raised a number of legal issues which we address in resolving this appeal: (1) whether the merger doctrine applies, particularly whether the warranty deeds conveying the land were an integration of the parties' agreements and extinguished any other oral agreements conveying irrigation water rights; (2) if the warranty deeds constitute the parties' integrated agreements, whether parol evidence, evidence of other agreements entered into prior to conveyance of the deed, should have been excluded; (3) whether the statute of frauds, Utah Code Ann. §§ 25–5–1 to –9 (1998), bars enforcement of any oral contracts regarding water rights between the parties, or whether the statute of frauds is inapplicable because plaintiffs undertook acts of part performance; (4) whether defendant Edward Warr could convey the interest his wife Hazel Warr had in the irrigation water rights as her agent, and if Edward had no authority to do so, whether Hazel, because of her actions, is estopped from claiming Edward could not convey the rights; (5) whether the plaintiffs' claims are barred by the statute of limitations, Utah Code Ann. § 78–12–25 (1996), or whether the discovery rule tolls the statute; (6) whether the Lewises' alleged lack of contractual privity prevents them from suing the Warrs; and (7) whether the trial judge's award of an amount of water, as opposed to a percentage of water flow from a spring, was error. We address each issue in turn.

## ANALYSIS

### I. MERGER DOCTRINE

¶ 10 The Warrs argue that under the merger doctrine, the warranty deeds transferring title to the lots to the plaintiffs extinguished any oral contracts between the Warrs and the plaintiffs regarding water. The Warrs assert that warranty deeds are, as a matter of law, final integrated agreements to convey property, and therefore any alleged agreement regarding the irrigation water rights is unenforceable if not conveyed by deed. The Warrs maintain that the plaintiffs have no claim to the irrigation water because the warranty deeds did not convey irrigation water rights. The plaintiffs counter that, based upon the collateral rights exception to the merger doctrine, the merger doctrine is inapplicable. They argue that because the parties did not intend performance of their agreement to be complete upon execution of the deed—the Warrs intended to deliver the irrigation rights later—the irrigation water was not part of the subject matter of the land title transaction, and the exception applies. The Warrs contend that the collateral rights exception cannot apply here because oral terms relating to title cannot be collateral.

¶ 11 Whether we even address this issue, however, depends on whether the issue was adequately preserved for appeal. That is, "[the] trial court must be offered an opportunity to rule on an issue." *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998) (citations omitted). Plaintiffs claim, as a preliminary matter, that the issue was not sufficiently raised before the trial court and preserved for appeal. The Warrs claim the issue was adequately preserved simply because the trial court ruled on it. We agree. By ruling on the question, the trial court demonstrated that the issue was brought to its attention, and the issue has been sufficiently preserved for our review.

¶ 12 The standard of review we apply here is a correctness standard. The applicability of the merger doctrine, that is, whether the warranty deeds conveying the lots to the plaintiffs were integrations of the parties' agreements that extinguished any other oral agreements regarding irrigation water rights, is a question of law that is reviewed for correctness, and we afford no deference to the trial court. *See Dansie v. Hi–Country Estates Homeowners Ass'n*, 1999 UT 62, ¶ 19, 987 P.2d 30; *Secor v. Knight*, 716 P.2d 790, 792 (Utah 1986).

¶ 13 The merger doctrine, as a general rule, declares " 'that on delivery and

acceptance of a deed the provisions of the underlying contract for the conveyance are deemed extinguished or superseded by the deed.' " *Dansie,* 1999 UT 62 at ¶ 19, 987 P.2d 30 (quoting *Secor,* 716 P.2d at 792). The doctrine applies "when the acts to be performed by the seller in a contract relate only to the delivery of title to the buyer." *Stubbs v. Hemmert,* 567 P.2d 168, 169 (Utah 1977). "Execution and delivery of a deed by the seller then usually constitute full performance [by the seller], and acceptance of the deed by the buyer manifests [the buyer's] acceptance of that performance even though the estate conveyed may differ from that promised in the antecedent agreement." *Id.* As a result, where the acts to be performed by the seller in a contract relate to the delivery of title, the deed is the final agreement and all prior terms are extinguished and unenforceable. *Id.*

■ ¶ 14 There are certain exceptions to the application of the merger doctrine, however. *Dansie,* 1999 UT 62 at ¶ 19, 987 P.2d 30; *Secor,* 716 P.2d at 793. Under the collateral rights exception, if the original contract calls for performance of some act that is collateral to the conveyance of title, the contractual obligations are not extinguished, but instead survive the deed. *Stubbs,* 567 P.2d at 169, *construed in Dansie,* 1999 UT 62 at ¶ 20, 987 P.2d 30, *and Secor,* 716 P.2d at 793. The question, therefore, is whether the agreement to convey irrigation water rights was collateral to the agreement to convey title.

■ ¶ 15 "Whether the terms of the contract are collateral, or are part of the obligation to convey and therefore unenforceable after delivery of the deed, depends to a great extent on the intent of the parties with respect thereto." *Stubbs,* 567 P.2d at 169, *cited in Dansie,* 1999 UT 62 at ¶ 20, 987 P.2d 30. "When seller's performance is intended by the parties to take place at some time after the delivery of the deed it cannot be said that it was contemplated by the parties that delivery of the deed would constitute full performance on the part of the seller, absent some manifest intent to the contrary." *Stubbs,* 567 P.2d at 169–70, *quoted in Dansie,* 1999 UT 62 at ¶ 20, 987 P.2d 30.

¶ 16 We conclude that the collateral rights exception applies here. Arguably the deeds could have conveyed irrigation water rights, with the Warrs perfecting ownership in the Bleazard litigation later, then having title pass to the plaintiffs through the doctrine of after-acquired title. *See* Utah Code Ann. § 57–1–10 (2000). However, it is undisputed by the parties that the Warrs planned on conveying title to the plaintiffs after the delivery of the deeds to the lots. More importantly, the trial judge found that "the Warranty Deeds ... were not intended to be a complete integration of the parties' understanding." Thus, the intent of the parties as determined by the trial judge was to finalize the irrigation water bargain after title to the lots had been delivered. Specifically, the Warr's performance, delivery of the irrigation water rights, was intended by the parties to take place at some time after the delivery of the deed. Moreover, unlike *Dansie* where residential property covenants and restrictions, matters that burden the title, were not collateral because they related to the same subject matter as the deed, 1999 UT 62 at ¶ 21, 987 P.2d 30, in this case the irrigation water rights are not necessarily appurtenant to the lots but are separate rights, distinct from the subject matter of the deed, that the parties planned to have transferred by a subsequent deed at a later date. As a result, the collateral rights exception applies, meaning the merger doctrine does not extinguish the irrigation water agreement. The trial court did not err in concluding that the merger doctrine did not extinguish the agreement for irrigation water rights.

## II. THE PAROL EVIDENCE RULE

■ ¶ 17 The Warrs claim the trial court erred in admitting evidence regarding the oral assurances made by the Warrs to provide the plaintiffs with irrigation water because, they assert, the parol evidence rule prohibits the introduction of evidence relating to any oral agreements formed prior to the transfer of the deeds. The plaintiffs argue that the parol evidence rule is inapplicable here because the rule applies only where the parties execute a writing, and no

writing regarding irrigation water rights was executed, or necessary to enforce the contract in question. Additionally, claim the plaintiffs, evidence relevant to the question of whether the warranty deeds were integrated agreements is admissible, and because the evidence received pertained to whether the warranty deeds were integrations of the parties' entire agreement, the trial court did not err.

¶ 18 Although the parol evidence rule developed at common law as a principle of contract interpretation and is not a creature of the formal rules of evidence, as its name suggests, it functions as a rule of evidence. *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1313 n. 2 (Utah Ct.App. 1991). Because the determination of whether to admit parol evidence is a question of law, we review for correctness; but at the same time, because a trial court must consider facts offered by the parties regarding whether they adopted a writing or writings as a complete integration of their agreement, we incorporate a clearly erroneous standard of review for these subsidiary factual determinations. *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995) (" '[W]hether evidence is admissible is a question of law, which we review for correctness, incorporating a "clearly erroneous" standard of review for subsidiary factual determinations.' " (citation omitted)).

¶ 19 "The general rule is that in the absence of fraud, an apparently complete and certain agreement which the parties have reduced to writing will be conclusively presumed to contain the whole agreement; and that parol evidence of contemporaneous [or prior] conversations, representations or statements will not be received for the purpose of varying or adding to the terms of the written agreement." *Eie v. St. Benedict's Hosp.*, 638 P.2d 1190, 1194 (Utah 1981) (citing *B.T. Moran, Inc. v. First Sec. Corp.*, 82 Utah 316, 24 P.2d 384 (1933)). This general rule applies only to integrated contracts, though. *Id.* Thus, when presented with a written agreement that one of the parties insists is an integration, the court must consider whether the agreement is, in fact, integrated. " 'In determining the issue of the completeness of the integration in writing, evidence extrinsic to the writing itself is admissible ... to show the circumstances under which the agreement was made and the purpose for which the instrument was executed.' " *St. Benedict's Hosp.*, 638 P.2d at 1194 (quoting *Bullfrog Marina, Inc. v. Lentz*, 28 Utah 2d 261, 266, 501 P.2d 266, 270 (1972)).

¶ 20 In the instant case, the trial court was presented with a writing or writings that one of the parties insisted was an integration: The Warrs contended that the deeds conveying the subdivided lots to the plaintiffs were integrations of the parties' agreements; the plaintiffs disagreed. Consequently, in considering whether the deeds were, in fact, integrations of the parties' agreements, extrinsic parol evidence was admissible to determine whether the parties adopted the warranty deeds as a final expression of their agreements. Indeed, in evaluating the circumstances under which the agreements for irrigation water were made and the purpose for which deeds were executed, the court was required to admit and consider extrinsic parol evidence. The trial court determined that "the Warranty Deeds by which the Plaintiffs' lots were conveyed were not intended to be a complete integration of the parties' understanding." We conclude that the trial court did not err in admitting parol evidence to determine that the parties did not adopt the warranty deeds as final expressions of their agreements regarding the irrigation water.

## III. STATUTE OF FRAUDS

¶ 21 The Warrs insist the statute of frauds, Utah Code Ann. §§ 25–5–1 to –9 (1998), bars enforcement of the plaintiffs' alleged contracts for irrigation water rights because, they claim, the contracts are for a real property interest. They note that section 25–5–1 requires interests in real property to be conveyed by "act or operation of law, or by deed or conveyance in writing," and claim that because the irrigation water rights were never conveyed by deed, the plaintiffs have no such rights. The plaintiffs contend that their claims are not barred because the statute of frauds is inapplicable due to the doctrine of part performance. The Warrs counter that the equitable doctrine of part performance

does not take the parties outside of the statute of frauds because the plaintiffs have not demonstrated sufficient part performance. They claim the alleged part performance, the purchase of the lots, is not "exclusively referable" to the contracts for water, and, therefore, the part performance exception to the statute of frauds does not apply.

¶ 22 Generally, a conveyance of real property is within the statute of frauds and unenforceable absent a writing. *Martin v. Scholl,* 678 P.2d 274, 275 (Utah 1983). "However, the doctrine of part performance allows a court of equity to enforce an oral agreement, if it has been partially performed, notwithstanding the statute [of frauds]." *Id.;* Utah Code Ann. § 25–5–8 (1998) ("Nothing in this chapter contained shall be construed to abridge the powers of courts to compel the specific performance of agreements in case of part performance thereof."). The question, therefore, is whether the oral agreement pertaining to the irrigation water rights was partially performed by the plaintiffs.

¶ 23 In previous cases involving the part performance exception to the statute of frauds, we have articulated the following standard of review:

> In an equity review of facts if the record shows a fair preponderance, or even if the evidence is balanced evenly, the trial court finding should be sustained. If the evidence is so vague and uncertain that the finding is obviously erroneous, there may be a new finding on review.

*Randall v. Tracy Collins Trust Co.,* 6 Utah 2d 18, 23, 305 P.2d 480, 483 (1956), *quoted in Scholl,* 678 P.2d at 275. The applicability of the statute of frauds is a question of law to be reviewed for correctness. However, because a trial court must consider facts offered by the parties regarding part performance of the agreement, we follow the above-articulated standard of review for these subsidiary factual determinations and will reverse only " '[i]f the evidence is so vague and uncertain that the finding is obviously erroneous.' " *Scholl,* 678 P.2d at 275 (quoting *Randall,* 6 Utah 2d at 23, 305 P.2d at 483).

¶ 24 The standard for sufficient partial performance in Utah is as follows: [1] the oral contract and its terms must be clear and definite; [2] the acts done in performance of the contract must be equally clear and definite; and [3] the acts must be in reliance on the contract. Such acts in reliance must be such that (a) they would not have been performed had the contract not existed, and (b) the failure to perform on the part of the promisor would result in fraud on the performer who relied, since damages would be inadequate. Reliance may be made in innumerable ways, all of which could refer exclusively to the contract.

*Scholl,* 678 P.2d at 275 (quoting *Randall,* 6 Utah 2d at 24, 305 P.2d at 484). We have also indicated that evidence of partial performance must be "strong," *Scholl,* 678 P.2d at 275, and we expressed the preference for "acts-oriented rather than word-oriented" evidence, *id.* at 275–76. In explaining the significance of exclusively referable part performance evidence, we stated:

> "[A]cts of part performance must be exclusively referable to the contract in that the possession of the party seeking specific performance and the improvements made by him [or her] must be reasonably explicable only on the postulate that a contract exists. The reason for such requirement is that the equitable doctrine of part performance is based on estoppel and unless the acts of part performance are exclusively referable to the contract, there is nothing to show that the plaintiff relied on it or changed his [or her] position to his prejudice...."

*Scholl,* 678 P.2d at 277 (quoting *In re Roth's Estate,* 2 Utah 2d 40, 44, 269 P.2d 278, 281 (1954)) (alterations in original). We also explained, however, that under certain circumstances the exclusively referable requirement may be relaxed. *Scholl,* 678 P.2d at 277–78. "[T]he more conclusive the direct proof of the contract, the less stringent the requirement of exclusively referable acts." *Id.* at 278.

¶ 25 In the instant case, we conclude that the plaintiffs' performance removed the oral agreements from the statute of frauds. First, the oral contract and its terms are

clear and definite. The trial court determined that "[t]he inclusion of irrigation water in the purchase price of the plaintiffs' lots was a basis of the bargain [to purchase the lots]." Despite the fact that the parties' testimony regarding the irrigation water contracts conflicts (plaintiffs claim they paid for the water as part of the purchase price of the lots while the Warrs claim the water had to be bought for an additional sum), the trial court expressly noted, *"The terms of the oral contracts were clear and definite,* and Plaintiffs undertook acts of part performance which removed the oral contracts from the statute of frauds." (Emphasis added.) The trial court further noted that "[t]here is also overwhelming independent evidence of the oral contracts in the affidavit filed by the Warrs in the Bleazard litigation, the representations made by the Warrs in their dealings with the Tooele Planning Commission, and the representations made by the Warrs in their communications with the State Engineer." For these reasons the trial court concluded that the exclusively referable requirement was relaxed. The Warrs have not persuaded us that the trial court's conclusion that the terms of the agreements—asserting that the plaintiffs paid for the irrigation water rights as part of the purchase price of the lots—are not clear and definite.

¶ 26 Second, the acts done in performance of the contract are equally clear and definite. The trial court found that the parties paid money for the irrigation water at the time they paid for their lots. Payment of additional consideration for the irrigation water rights constitutes performance of the plaintiffs' contractual obligation.

¶ 27 Third, the plaintiffs' acts were done in reliance on the contract. The plaintiffs paid for the irrigation water rights in reliance on the Warrs' representation that deeds to the water rights would be delivered. Payment of funds *for the water rights* would not have been made had the oral agreements not existed. Moreover, failure by the Warrs to perform their obligation would result in fraud on the plaintiffs who paid for the water rights. Inasmuch as the trial court's findings articulate conclusive and direct proof of the oral contracts for irrigation water, the exclu-sively referable requirement was appropriately relaxed by the trial court.

¶ 28 Finally, the Warrs have not persuaded us that the evidence regarding the terms of the parties' agreements for irrigation water is so vague and uncertain that the trial court's conclusion that the terms of the contract were clear and definite is obviously erroneous. To the contrary, the evidence as found supports the trial court's determination that the Warrs agreed to provide irrigation water to the plaintiffs and that the plaintiffs paid for the water as part of the purchase price of their respective lots. As a result, we affirm the trial court's determination that the oral contracts for irrigation water were outside of the statute of frauds based on the doctrine of part performance.

## IV. AGENCY

¶ 29 The Warrs argue that any sale of irrigation water was void without Hazel Warr's approval. They claim that because Hazel "is a joint owner of the Irrigation Water with Edward Warr, the water cannot be conveyed without her authority." The Warrs claim Hazel never authorized anyone to sell or convey her interest, and therefore those who allegedly promised the plaintiffs the water rights, Edward and Clayton Warr (the Warrs' son), lacked authority to sell Hazel's interest. Plaintiffs argue that Edward and Clayton had both actual and apparent authority to act as Hazel's agents and to sell her interest in the irrigation water. They argue that Hazel testified that Clayton was authorized to act on her behalf (actual authority), and they claim she made manifestations to third persons that they were her agents (apparent authority). Plaintiffs further assert that Hazel is estopped from arguing that she is not bound by promises made to the plaintiffs by her husband because she ratified the representations by remaining silent. The Warrs claim that any ratification cannot be inferred from silence because the law requires a writing to enforce agreements for property rights such as irrigation water rights and therefore any ratification of Edward's actions by Hazel must have been in writing.

¶ 30 We find this contention of the Warrs to be meritless. First, Hazel Warr herself was involved in the sale of the lots and negotiated with the plaintiffs regarding the irrigation water rights and price to be paid for the lots. Hazel herself testified that she discussed irrigation water rights with the plaintiffs when they bought the lots. Hazel testified that she was involved in negotiations with the Thomases. The Martinezes testified that she negotiated with them when they purchased their lot, and Wayne Reynolds testified that he negotiated the price of his lot with both Hazel and Edward. The Rubens also testified that Hazel was present when they negotiated the price for their lot, and Hazel testified that she signed documents on behalf of her husband in the sale to the Rubens. The Warrs' own affidavit submitted to the district court in the Bleazard litigation stated that "*we* filed an application," "*we* subdivided and platted," and "*we* have sold six of the eleven lots." Given Hazel Warr's first-hand involvement in the negotiations and sale of the lots, we conclude it is unnecessary to analyze whether Edward acted as her agent.

## V. STATUTE OF LIMITATIONS

¶ 31 The Warrs argue the four-year statute of limitations, Utah Code Ann. § 78–12–25 (1996), bars plaintiff's suit. The plaintiffs counter that the statute of limitations is tolled by the discovery rule. According to the plaintiffs, the Warrs misled them into believing they were trying to satisfy their obligation to provide irrigation water, thereby tolling the statute. Plaintiffs contend they had no reason to know they had a cause of action against the Warrs until late 1995 when they discovered the Warrs were not going to perform their alleged obligation of providing irrigation water. The Warrs respond that the statute is not tolled by the discovery rule because plaintiffs did not exercise due diligence to discover their cause of action.

¶ 32 The applicability of a statute of limitations and the applicability of the discovery rule are questions of law, which we review for correctness. *See, e.g., Quick Safe–T Hitch, Inc. v. RSB Sys. L.C.*, 2000 UT 84,

¶ 10, 12 P.3d 577; *Klinger v. Kightly*, 791 P.2d 868, 869–70 (Utah 1990). However, the applicability of the statute of limitations and the discovery rule also involves a subsidiary factual determination—the point at which a person reasonably should know that he or she has suffered a legal injury. This is a question of fact. *See, e.g., Sevy v. Sec. Title Co. of S. Utah*, 902 P.2d 629, 634 (Utah 1995); *Andreini v. Hultgren*, 860 P.2d 916, 919 (Utah 1993) ("The point at which a person reasonably should know that he or she has suffered a legal injury is a question of fact.") Accordingly, we review for correctness, incorporating a clearly erroneous standard of review for the subsidiary factual determination of when the plaintiffs should have known of their alleged legal injuries.

¶ 33 "Generally, a cause of action accrues 'upon the happening of the last event necessary to complete the cause of action.' " *Berenda v. Langford*, 914 P.2d 45, 50 (Utah 1996) (quoting *Myers v. McDonald*, 635 P.2d 84, 86 (Utah 1981)). Thus, "statutes of limitations begin running upon the happening of the last event necessary to complete the cause of action." *Burkholz v. Joyce*, 972 P.2d 1235, 1236 (Utah 1998). In certain instances, however, the discovery rule tolls the limitations period until facts forming the basis for the cause of action are discovered. *Id.* at 50–51. The discovery rule applies:

> (1) in situations where the discovery rule is mandated by statute; (2) in situations where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct; and (3) in situations where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action.

*Warren v. Provo City Corp.*, 838 P.2d 1125, 1129 (Utah 1992) (footnote citations omitted). "Under the discovery rule, ' "the limitations period does not begin to run until the discovery of facts forming the basis for the cause of action." ' " *Berenda*, 914 P.2d at 51 (quoting *O'Neal v. Div. of Family Servs.*, 821 P.2d 1139, 1143 (Utah 1991) (quoting *Myers*, 635 P.2d at 86)).

¶ 34 Plaintiffs' complaint alleges breach of oral contract and requests specific performance, or, in the alternative, damages. The limitations period for bringing a claim for breach of an oral contract is four years. Utah Code Ann. § 78–12–25(1) (1996). Plaintiffs filed their complaint on January 25, 1999. Essential to our decision, therefore, is when the last event necessary to complete the cause of action for breach of contract occurred, i.e., when plaintiffs were on notice that the Warrs were not going to provide irrigation water as agreed. If this event occurred four years or more prior to when the complaint was filed, we must determine whether the discovery rule tolled the statute of limitations.

¶ 35 The statute of limitations for plaintiffs' breach of contract action began to run in late 1995. The trial court found that "[i]n late 1995, the Warrs began contacting the plaintiffs and informing them that they could now have their quitclaim deeds to the water rights, but that they would have to pay between $2,500 and $5,000 for them." Thus, the plaintiffs knew or should have known that the Warrs were not going to deliver the irrigation water rights as promised, thereby breaching the agreement, as of "late 1995," when the Warrs demanded that plaintiffs pay additional consideration for the water.

¶ 36 Inasmuch as the plaintiffs filed their complaint in January 1999, and the trial court found that the statute of limitations began to run when the plaintiffs knew or should have known that the Warrs were not going to deliver the irrigation water rights as promised in late 1995, the plaintiffs filed their complaint within the four year period. We therefore need not determine whether the statute of limitations was tolled for plaintiffs' breach of contract action.

## VI. PRIVITY

¶ 37 The Warrs argue the Lewises lack privity of contract to sue the Warrs. They argue the quitclaim deed from the Crittendens to the Lewises is not an assignment of rights, and therefore, the Lewises have no contractual claim against the Warrs. Plaintiffs respond by arguing that the Lewises are successors to the Crittenden's claims because the Crittendens, by quitclaim deed, conveyed all of their interests in the irrigation water to the Lewises.

¶ 38 Whether the Lewises received, by assignment, the Crittendens' contractual claim to the irrigation water rights is a question of law that we review for correctness, incorporating a clearly erroneous standard of review for these subsidiary factual determinations. *See, Winegar v. Froerer Corp.*, 813 P.2d 104, 107–08 (Utah 1991).

¶ 39 An assignment is interpreted as is any other contract. *Id.* at 108. "In interpreting a contract, the intentions of the parties are controlling." *Central Florida Investments, Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599. When presented with a written instrument, we look first to the four corners of the agreement to determine the parties' intentions. *Id.* If the language within the four corners in unambiguous, the parties' intentions are determined from the plain meaning of the contractual language. *Id.* If the instrument is ambiguous, the court may look to extrinsic evidence. *Id.*

¶ 40 The Lewis–Crittenden deed is unambiguous. We note again that in October 1997, the Lewises purchased their lot from the Crittendens who initially purchased it from the Warrs. *Supra*, n. 6. Later, in December 1999, the Lewises bargained for and received, by quitclaim deed, not only all water rights which the Lewises had "appurtenant to or associated with" the lot but also any contractual claims the Crittendens had against the Warrs. The Lewis–Crittenden deed reads, in relevant part:

> [The Crittendens], Grantors, hereby quitclaim all Grantors' right, title and interest, in any and all water or water rights, including without limitation, all wells, springs, ditches and reservoirs, appurtenant to or associated with that certain real property ... whether decreed or undecreed, tributary or nontributary, surface or underground, appropriated or unappropriated, and all shares of stock in any water company, *and all well permits, water services, contracts, and other evidences of any such water rights*, to [the Lewises].

(Emphasis added.) It is clear that the deed assigned to the Lewises the Crittenden's contractual interest in the irrigation water rights. Accordingly, the Lewises are entitled to bring against the Warrs any contractual action the Crittenden's could have brought, including the instant claim for the irrigation water rights.

## VII. TRIAL COURT'S JUDGMENT AWARDING AN AMOUNT OF WATER VERSUS A PERCENTAGE OF FLOW

¶ 41 The Warrs argue that the trial court's judgment requiring them to convey to plaintiffs by quitclaim deed "sufficient water from their interest in the Rose Spring to irrigate each of their five-acre lots, i.e., 0.079 cfs for each lot" is unreasonable because they cannot guarantee they will be able to provide this amount of water each season. Plaintiffs counter that the judgment was not excessive. Plaintiffs assert that based on the testimony offered at trial, the amount ordered will reasonably irrigate five acres, as the plaintiffs were promised when they purchased their respective lots, sufficient water to irrigate their land.

¶ 42 "Specific performance is a remedy of equity which is addressed to the sense of justice and good conscience of the court, and accordingly, considerable latitude of discretion is allowed in [the trial court's] determination as to whether it shall be granted and what judgment should be entered...." *Morris v. Sykes,* 624 P.2d 681, 684 (Utah 1981); *see also LHIW, Inc. v. DeLorean,* 753 P.2d 961, 963 (Utah 1988). Specific performance as a remedy will stand and will not be upset on appeal in the absence of an abuse of discretion. *Morris,* 624 P.2d at 684.

¶ 43 Plaintiffs request specific performance; their complaint requests "an Order of specific performance requiring the Warrs to convey to plaintiffs their respective shares (7.5 cfs.) of the Subject Water and to complete the delivery system from Rose Spring to the Rocky Top Subdivision." In awarding to plaintiffs "sufficient water ... to irrigate each of their five-acre lots, i.e., 0.079 cfs for each lot," the trial court considered what it determined the Warrs' contracted to provide plaintiffs, testimony from a professional engineer regarding how much water would be needed to irrigate five acres, and deeds the Warrs had prepared to convey the water rights. The trial court found that "[t]he Plaintiffs established ... that the Warrs intended, marketed, and sold the Plaintiffs' lots in the Rocky Top Subdivision with irrigation water sufficient to irrigate five acres," and that "the irrigation water rights were to be included in the price of the lots." Mr. Vern Loveless, a professional engineer, testified that .079 cfs of water would irrigate four and three-quarters acres; the remaining quarter acre would be maintained with non-irrigation water. Based on this testimony, the trial court determined that "[t]he amount of water necessary to irrigate five acres is .079 cfs, or twenty acre feet." Finally, the deeds prepared by the Warrs indicate that they intended to convey "seven and nine tenths percent (7.9%) of Change Application No. a–12993 *which represents* 0.0079 cfs from Rose Spring AKA Bryan Springs." (Emphasis added). Even though awarding a percentage of flow may seem sensible, given this information weighed by the trial court, we cannot say that the trial judge exceeded the permitted scope of discretion in granting specific performance and in entering the judgment it did.

## CONCLUSION

¶ 44 The trial court's judgment is affirmed.

¶ 45 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice DURRANT concur in Justice WILKINS' opinion.